**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CCM TOURING LLC,

Plaintiff,

v.

MOONBUG ENTERTAINMENT LIMITED,

*Defendant.*

---

MOONBUG ENTERTAINMENT LIMITED
and TREASURE STUDIO INC.,

*Counterclaim Plaintiffs.*

v.

CCM TOURING LLC and S2BN
ENTERTAINMENT CORPORATION,

*Counterclaim Defendants.*

Case No. 1:23-cv-07116 (VSB)

**AMENDED COUNTERCLAIM**


## AMENDED COUNTERCLAIM

Defendant/Counterclaim Plaintiff Moonbug Entertainment Limited ("Moonbug") and Counterclaim Plaintiff Treasure Studio Inc. ("Treasure Studio"), by and through their counsel, hereby submit the following Amended Counterclaim against Plaintiff/Counterclaim Defendant CCM Touring LLC ("CCM") and Counterclaim Defendant S2BN Entertainment Corporation ("S2BN").

**INTRODUCTION**

1.      This dispute arises out of CCM's breaches of the Exclusive Live Tour and Merchandise Services and License Agreement, between Moonbug and CCM, dated February 5, 2021 (the "Tour Agreement"), which obligated CCM to use its "best endeavours" to develop, produce, promote, put on, and sell tickets for a multi-jurisdictional, world-wide live touring show (the "CoComelon Tour") based on Moonbug's beloved *CoComelon* animated series.

2.      Despite its obligations to promote and produce the CoComelon Tour on a world-wide basis, CCM only briefly toured in the United States and Argentina, and abandoned an attempt to tour in Mexico, before pulling the plug entirely.  Further, even when the CoComelon Tour was ongoing, CCM failed to tour competently or support the tour with the contractually agreed-upon minimum marketing spend specified in the Tour Agreement.  These breaches of the Tour Agreement have cost Moonbug substantial lost royalties that Moonbug would have earned had CCM honored its contractual obligations to Moonbug and competently performed.  S2BN, as CCM's parent guarantor under the Tour Agreement, is liable to Moonbug for these amounts as well.

3.      CCM has refused to accept responsibility for its misconduct and breaches. Instead, it has filed claims against Moonbug in which CCM has misguidedly attempted to blame Moonbug for CCM's failure to successfully tour, arguing that Moonbug's licensing of its CoComelon intellectual property to a different company to put on a CoComelon character experience called "CoComelon Party Time" excused CCM's non-performance and prevented CCM's rights to countries in which the CoComelon Tour was never launched from reverting to Moonbug.

4.    The High Court of Justice, Business and Property Courts of England and Wales, King's Bench, Commercial Court (the "English Court") has already rejected the majority of these contentions.  In connection with the declaratory relief action that Moonbug filed against CCM and S2BN in the English Court, captioned *Moonbug Entertainment Limited v. CCM Touring LLC and S2BN Entertainment Corporation*, Case No. CL-2023-000768 (the "English Action"), the English Court entered judgment in Moonbug's favor and, upon CCM and S2BN admitting that Moonbug was so entitled, declared that "the licensed rights in respect of the CoComelon Tour granted by [Moonbug] to [CCM] under the Agreement in relation to any territory of the world other than the United States of America, Canada, and Argentina terminated and reverted to [Moonbug]."

5.    Considering the judgment of the English Court, CCM's repudiation of the Tour Agreement through its refusal to tour in any remaining jurisdiction to which CCM would otherwise maintain rights, and Moonbug's election to exercise its rights of termination due to CCM's uncured material breaches, what remains for this Court to do is award Moonbug money damages and declare that Moonbug has validly terminated the Tour Agreement.

## THE PARTIES

6.    Moonbug Entertainment Limited is a private limited company incorporated in England & Wales with its principal place of business in London, England.  Moonbug is a children's media company that creates, produces, and distributes children's video and audio content.  Moonbug's content includes many well-known and popular children's shows, including *CoComelon*, *Little Baby Bum*, *Little Angel*, *Blippi*, *Oddbods*, and *Morphle*.  By virtue of where it is incorporated and maintains its principal place of business, Moonbug is a citizen of England.

7.     Treasure Studio Inc. is a California corporation with its principal place of business in California.  Treasure Studio is a corporate affiliate of Moonbug and the original owner of the CoComelon brand prior to Moonbug's acquisition of CoComelon in July 2020.  By virtue of where it is incorporated and maintains its principal place of business, Treasure Studio is a citizen of California.

8.     CCM Touring LLC is a Delaware limited liability corporation with its principal place of business in New York, New York.  CCM is a single purpose entity that was established solely for the purpose of putting on the CoComelon Tour and has no other business activities. CCM's sole member is EMC Presents LLC, itself a Delaware limited liability corporation.  EMC Presents, LLC has two members S2BN Capital, LLC and Eventim Live USA, Inc.  S2BN Capital, LLC is owned by S2BN Entertainment Corporation, a Delaware corporation with its principal place of business in New York, New York.  Eventim Live USA, Inc. and S2BN Entertainment Corporation are both Delaware corporations with their principal places of business in New York, New York.  By virtue of where its members maintain their principal places of business and are organized, CCM is a citizen of Delaware and New York.

9.     As noted, S2BN Entertainment Corporation is a Delaware corporation with its principal place of business in New York, New York.  S2BN specializes in the acquisition, development, production, and promotion of touring exhibitions, events, and live performances. By virtue of where it is incorporated and maintains its principal place of business, S2BN is a citizen of Delaware and New York.  S2BN's employees and managing agents operate CCM.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this Amended Counterclaim pursuant to 28 U.S.C. § 1367 and Federal Rule of Civil Procedure 13.

11.     This Court has personal jurisdiction over CCM because CCM's principal place of business is in New York, New York and CCM has consented to the jurisdiction of this Court by filing the Complaint and Amended Complaint in this Court.

12.     This Court has personal jurisdiction over S2BN because S2BN's principal place of business is in New York, New York.

13.     Venue is proper under 28 U.S.C. § 1391 because CCM and S2BN's principal places of business are in this district.

14.     All conditions precedent to the prosecution of this action have been satisfied, fulfilled, extinguished, waived, or otherwise executed.

## FACTUAL BACKGROUND

### A.    Moonbug And CCM Enter Into The Tour Agreement.

15.     Moonbug operates globally, creating and producing animated and audio-visual content aimed at children.  Moonbug and its affiliates (including Treasure Studio) own, amongst other things, all intellectual property rights connected with CoComelon, the world's most watched children's YouTube channel, and license such rights to third parties for commercial exploitation.

16.     To capitalize on the growing success of CoComelon, Moonbug retained CCM and S2BN to develop, produce, promote, and put on a live touring show based upon Moonbug's highly successful CoComelon intellectual property.  The live touring show was to be called *CoComelon Live! JJ's Journey* ("*CoComelon Live*").

17.     S2BN was selected because it is a live entertainment company specializing in the acquisition, development, production, and promotion of touring exhibitions, events, and live performances and was willing to provide a $2,000,000 non-refundable, recoupable, royalty

advance.  CCM is the special purpose entity that S2BN created for purposes of putting on the CoComelon Tour that is run by S2BN's employees and managing agents.  CCM has no business operations aside from the CoComelon Tour (which, as discussed below, has not performed for over a year).

18.     The terms of Moonbug and CCM's agreement are reflected in the Exclusive Live Tour and Merchandise Services and License Agreement dated February 5, 2021 (the "Tour Agreement").  A true and correct copy of the Tour Agreement is attached hereto as **Exhibit A**. Under the Tour Agreement, Moonbug agreed to provide a limited license to use the CoComelon intellectual property for purposes of putting on the CoComelon Tour.  CCM, in turn, covenanted to "perform and provide development, preparation, management, production, presentation and/or promotional services" in connection with launching the international CoComelon Tour and to pay Moonbug a royalty of ticket and merchandise sales.  *See* Exhibit A, Tour Agreement, §§ 1.1, 4.2.

19.     More specifically, as relevant here, under Schedule 1 of the Tour Agreement, CCM was required to "(a) advertise and promote the Shows, the CoComelon Tour and the Merchandise; (b) use its best endeavours to sell (i) tickets for the Shows, and (ii) Merchandise; (c) procure the availability of suitable venues for the Shows and CoComelon Tour in accordance with all applicable safety codes, regulations and laws; (d) procure the provision and presence of comprehensive and appropriately trained security at the venues and for the Shows and CoComelon Tour…; (e) obtain all licences, consents, permits, certificates, authorisations or approvals [necessary] … to comply with and fulfil all conditions and covenants contained therein; and (f) provide all other services normally provided by production companies/promoters of a first-class stature."  *Id*., § 1.1, Schedule 1.

- 6 -

20.    Further, under Sections 4.2.1 & 4.2.2 of the Tour Agreement, CCM agreed to pay Moonbug a royalty of 8-13% of its Net Gross Box Office Receipts,[1] as well as a royalty of 12% of its Net Gross Merchandise Revenue,[2] a royalty of 20% of Licensee Procured Sponsorship Revenue,[3] and a royalty of 25% of Licensor Procured Sponsorship Revenue.[4]  *Id.*, §§ 4.2.1, 4.2.2.  These royalties were recoupable against the $2,000,000 non-refundable royalty advance that CCM and S2BN were to provide to Moonbug for agreeing to retain CCM and S2BN.  *Id.,* § 4.

21.    Importantly, the CoComelon Tour that CCM contracted to use its "best endeavours" to put on and sell tickets for was supposed to be a world-wide tour that would appear not just in the United States, but in all countries in which there was sufficient commercial demand.  To that end, Section 3.1 of the Tour Agreement obligated CCM to "present [Moonbug] with a preliminary international roll out plan for the CoComelon Tour in respect of all countries

---

[1]    "Net Gross Box Office Receipts" is defined as "Gross Box Office Receipts less only applicable sales taxes, approved deductions of any kind including approved ticketing charges, and approved commissions.  For these purposes, 'approved' means approved in writing by [Moonbug]." *Id.* § 4.11.  The Net Gross Box Office Receipts royalty began at 8% for the first 12 months after the first ticketed performance and increased thereafter depending on how long the CoComelon Tour had been running.  *Id.*, § 4.2.1.

[2]    "Net Gross Merchandise Revenue" is defined as "Gross Merchandise Revenue less all applicable sales taxes, actual out of pocket approved ticketing charges, [CCM]'s actual out of pocket approved commissions, and actual out of pocket third party, direct approved costs such as venue merchandise commissions." *Id.*, § 4.11.

[3]    "Licensee Procured Sponsorship Revenue" is defined as "gross sponsorship revenue relating to the CoComelon Tour (net only of applicable sales taxes) arising from sponsorship opportunities that have been solely directly and identifiably procured by the Licensee, and shall also include any applicable fees, commissions, rebates and other monies receivable or creditable in respect of such sponsorship." *Id.*, § 4.4.

[4]    "Licensor Procured Sponsorship Revenue" is defined as "gross sponsorship revenue relating to the CoComelon Tour (net only of applicable sales taxes) other than Licensee Procured Sponsorship Revenue and shall also include any applicable fees, commissions, rebates and other monies receivable or creditable in respect of such sponsorship." *Id*.

… within nine (9) months of the date of execution hereof" and further required CCM to "use [its] best endeavours to commence to exploit the rights no later than nine (9) months after presenting and parties agreeing [to the international roll out] plan…" *Id.,* § 3.1.

22.    To give teeth to this contractual requirement and ensure that CCM performed as promised, Section 3.1 further stated that, in the event CCM failed to launch the CoComelon Tour in any country within thirty-three (33) months after the Tour Agreement was executed, the rights to tour in said country would automatically revert to Moonbug:

> [I]n the event that [CCM] takes more than twenty-four (24) months (which for the avoidance of doubt shall be thirty three (33) months from execution of this Agreement) to commence the CoComelon Tour in a particular country, the rights for the particular country immediately revert to [Moonbug] who is then free to present or enter into an exclusive agreement with a third party for that respective country.  For the purposes of this clause, exploitation of the rights shall mean that there has been a **meaningful ticketed presentation** of the CoComelon Tour.

*Id.,* § 3.1 (emphasis added).

23.    Thus, under Section 3.1, not only was CCM obligated to use its "best endeavours" to launch the CoComelon Tour internationally within eighteen (18) months of execution of the Tour Agreement, CCM explicitly agreed that it would forever lose such international rights should CCM fail to tour in any specific country by November 5, 2023.[5]

24.    To ensure the success of the CoComelon Tour, CCM also promised to "fund a non-recoupable i) initial production budget of not less than [] $1,650,000…for the first run of the Show and ii) to a minimum weekly marketing spend of not less than ten (10%) percent of the potential Gross Box Office Receipts during each tour run." *See id.*, § 4.1.

---

[5]    November 5, 2023 was thirty-three (33) months from the execution of the Tour Agreement and thus the date on which CCM's rights to countries in which it had failed to launch would revert to Moonbug.

25.    S2BN signed the Tour Agreement's "Parent Guarantee."  In full, the Parent Guarantee states:

> We hereby guarantee the performance by CCM Touring LLC ("Company") of all of the obligations, warranties, representations and covenants made in the Agreement.  In the event Company does not do so, we agree to perform all of the obligations therein undertaken to be performed for you by Company and undertake to be bound thereby as though we were a party to said Agreement. We agree that you shall have the right in addition to any other remedies available to you at law or in equity or by reason of this Agreement to specifically enforce said Agreement against us in the event Company ceases to exist or in the event of the failure of Company to satisfy its obligations under the agreement.

*Id.*, Parent Guarantee.

26.    By virtue of the Parent Guarantee, S2BN has direct contractual liability to Moonbug for its own non-performance and for any of CCM's breaches of the Tour Agreement.

**B.    The CoComelon Tour Launches In The United States In 2021, But Fails To Support The CoComelon Tour And Ceases Touring In December 2022.**

27.    The CoComelon Tour launched in the United States on December 4, 2021 and ran in December 2021 with six performances in two cities.  The CoComelon Tour then relaunched in the United States in Spring 2022 in six cities for eight performances and again in Autumn 2022, for some 60-70 performances across 64 cities.

28.    Despite the number of cities in which the CoComelon Tour was able to perform, the financial performance of the CoComelon Tour was disappointing.  More specifically, the CoComelon Tour was not even able to generate enough revenue to cover the $2,000,000 recoupable royalty advance.

29.    This lack of commercial success was the direct result of both CCM's mismanagement, poor planning and incompetent execution, and breach of its contractual obligations to support the CoComelon Tour.

30.     For example, while it is industry custom and practice to tour on a continuous basis (so that momentum can build and operational costs can be reduced and amortized over a longer period), the CoComelon Tour in the United States began, paused, began again, paused, and then began yet again.

31.     In another example, contrary to its commitment to invest "a minimum weekly marketing spend of not less than ten (10%) percent of the potential Gross Box Office Receipts during each tour run," preliminary audit findings are that CCM's marketing spend fell short of that contractual requirement.  This appears to be why, during the final leg of the CoComelon Tour in Fall 2022, ticket sales fell from 73-100% of venue capacity to multiple tour dates that sold only 30-40% of venue capacity.

32.     Further compounding the problem, CCM failed to control the excessive operating costs of the tour while also setting ticket prices far too high.  The high ticket prices hampered CCM's ability to secure venues and tour dates, which combined with the high costs and lack of marketing spend, resulted in an unprofitable tour.

33.     CCM's failures to competently support the CoComelon Tour constitute material breaches of the Tour Agreement that proximately caused a drastic decline in ticket sales and tour success, consequentially leading to significant reductions in merchandising and sponsorship revenues and severely impacting Moonbug's returns and royalties.

**C.    The CoComelon Tour Launches In Argentina, But Nowhere Else.**

34.     Aside from the United States, the CoComelon Tour only ever launched in one other country: Argentina.  The CoComelon Tour appeared in Argentina in July 2023 and ran for three weeks, with 14 performances.  CCM has not put on the CoComelon Tour in Argentina after that three-week tour.

35.     Despite the parties' declared mutual objective to secure the success of a worldwide CoComelon Tour, there has been no exploitation by CCM of the rights granted to it under the Agreement to put on the CoComelon Tour in any country of the world other than the United States and Argentina.

36.     CCM's failure to use its "best endeavours" to tour internationally, as it specifically covenanted to do in Section 3.1 of the Tour Agreement, is a further material breach. As with CCM's failure to competently tour in the United States, CCM's failures to tour internationally constitute material breaches of the Tour Agreement that proximately caused lost ticket sales and tour success, consequentially leading to significant reductions in merchandising and sponsorship revenues and severely impacting Moonbug's returns and royalties from other CoComelon licensees.

**D.      The English Judgment Against CCM.**

37.     As a result of CCM's failure to tour anywhere other than the United States or Argentina, CCM's rights to all such other countries automatically reverted to Moonbug under Section 3.1 of the Tour Agreement.

38.     Because CCM was unwilling to accept such reversion (and instead claimed that CCM's rights had not reverted), Moonbug initiated a declaratory relief action against CCM and S2BN in the High Court of Justice, Business and Property Courts of England and Wales, King's Bench, Commercial Court (the "English Court"), captioned *Moonbug Entertainment Limited v. CCM Touring and S2BN Entertainment*, Case No. CL-2023-000768 (the "English Action").

39.     In the English Action, CCM and S2BN unsuccessfully contested whether they were subject to jurisdiction in England, arguing that CCM's claims against Moonbug in this

lawsuit required adjudication of the question of whether CCM was entitled to "tolling" of the applicable reversionary deadlines.

40.    The English Court, however, rejected CCM's contentions, ruling that CCM's application was "not well founded, and relatively plainly so" and its "only likely effect was to create delay through an interlocutory process calculated to frustrate [Moonbug's] contractual right to have its claim determined in th[e] court under English law."

41.    As a result of this ruling, CCM consented to the entry of judgment in the English Action.  The English Court thereafter declared, upon CCM and S2BN admitting that Moonbug was so entitled, that "the licensed rights in respect of the CoComelon Tour granted by [Moonbug] to [CCM] under the Agreement in relation to any territory of the world other than the United States of America, Canada, and Argentina terminated and reverted to [Moonbug]."  A true and correct copy of that judgment is attached hereto as **Exhibit B**.

**E.    Moonbug Defaults CCM For Failing To Tour; CCM Responds By Repudiating The Tour Agreement.**

42.    On January 8, 2024, Moonbug sent CCM a Notice of Default for Failure to Tour ("Notice of Default") and requested that CCM cure its default within thirty (30) calendar days of receipt as required under Section 6.7 of the Tour Agreement.  In the Notice of Default, Moonbug also notified CCM that it is liable for Moonbug's monetary damages because of CCM's failure to put on the CoComelon Tour.  A true and correct copy of the Notice of Default is attached hereto as **Exhibit C**.

43.    On February 6, 2024, CCM responded to the Notice of Default by disputing whether it is contractually obligated to tour.  Among other things, CCM argued that the Tour Agreement does not create an enforceable contractual obligation for CCM to tour and/or that CoComelon Party Time excused any touring obligation that CCM might have under the Tour

Agreement.  Notwithstanding those contentions, CCM also informed Moonbug that CCM intended to put on the CoComelon Tour in both the United States and Argentina in 2024 and 2025, but without providing any details or supporting information.  A true and correct copy of CCM's response to the Notice of Default is attached hereto as **Exhibit D**.

44.    After receiving CCM's response to the Notice of Default, Moonbug made repeated demands both that CCM resume touring in the United States and Argentina and for concrete touring plans.  To that end, on February 23, 2024, Moonbug wrote CCM to request assurances from CCM that it would perform under the Tour Agreement and again demanded that CCM provide its plans for the supposed 2024 tour.  A true and correct copy of Moonbug's February 23, 2024 letter is attached hereto as **Exhibit E**.

45.    In response to those repeated demands that CCM resume touring and for concrete touring plans, CCM continued to dispute whether it had any obligation to tour and also refused to provide any actual touring plans.  To that end, on March 1, 2024, CCM sent Moonbug a letter in which CCM again stated that it was not obligated to tour and argued that any performance obligation that it had was excused by Moonbug's alleged "antecedent material breach" of the Tour Agreement.  CCM further stated that it could not start touring in the United States until late 2024.  The letter went on to state that CCM was "working on the cast information" and is "in the process of mapping out an itinerary," without providing further specifics.  A true and correct copy of this letter is attached hereto as **Exhibit F**.

46.    Thereafter, in late June 2024, CCM finally provided Moonbug with a cursory list of cities in which it supposedly intended to tour in 2025.  However, that list of cities was again devoid of the business and creative details that Moonbug would need to approve for a tour to

happen.  Among other things, CCM's bare list of cities did not provide any business details, marketing plans, mounting costs, or cast information.

**F.      Moonbug Terminates The Tour Agreement; CCM Infringes On Moonbug's Intellectual Property Rights And Threatens To Re-Launch The CoComelon Tour.**

47.      On July 5, 2024, after approximately six months had elapsed since Moonbug sent CCM the Notice of Default, Moonbug decided that it had no choice but to terminate the Tour Agreement.  Accordingly, Moonbug sent CCM a "Notice of Termination: Exclusive Live Tour and Merchandise Services and License Agreement" ("Notice of Termination").  A true and correct copy of the Notice of Termination is attached hereto as **Exhibit G**.

48.      As a result of the termination of the Tour Agreement, CCM's limited license to use the CoComelon intellectual property other than to clear its inventory of existing merchandise was also terminated.  As such, following the termination of the Tour Agreement, CCM no longer had the right to exploit or utilize the CoComelon intellectual property to promote the CoComelon Tour.  Nevertheless, as of July 31, 2024, CCM continued to utilize the CoComelon intellectual property, most notably to advertise and promote the CoComelon Tour on its website https://www.cocomelonlive.com and (the "Infringing Website").  A screen capture of the landing page for the Infringing Website, captured on July 31, 2024, is attached hereto as **Exhibit H**.

49.      Rather than accept that the Tour Agreement had been validly terminated, CCM has continued to deflect and attempt to pin the blame on Moonbug.  Despite previously taking the position and filing this lawsuit against Moonbug based on the contention that CoComelon Party Time prevented CCM from putting on the CoComelon Tour, CCM has recently threatened to re-launch the CoComelon Tour even with CoComelon Party Time events ongoing.  To that end, on July 19, 2024, CCM responded to the Notice of Termination by stating that CCM "intends to proceed with the three-legged tour outlined in its business plan dated June 25, 2024,

and anticipates publicly announcing the tour on either August 13, 2024 or September 3, 2024."

A true and correct copy of this letter is attached hereto as **Exhibit I**.

50.     The Moonbug Parties have several copyrights relating to CoComelon registered with the United States Copyright Office ("CoComelon Works"), including:

      a.   U.S. Copyright No. VAu001379978 (JJ), issued November 12, 2019;

      b.   U.S. Copyright No. VAu001322038 (Unpublished Family Characters 2017), issued November 15, 2017;

      c.   U.S. Copyright No. VAu001319613 (Animal Characters 2017), issued November 15, 2017; and

      d.   U.S. Copyright No. VAu001374077 (Cocomelon Logo), issued October 30, 2019.

51.     The Moonbug Parties have several trademarks relating to CoComelon registered with the United States Patent and Trademark Office ("CoComelon Marks"), including:

      a.   U.S. Trademark Registration No. 6,375,368 for goods in Class 16;

      b.   U.S. Trademark Registration No. 6,399,106 for goods and services in Classes 16 and 41;

      c.   U.S. Trademark Registration No. 5,830,142 for goods and services in Classes 9 and 41;

      d.   U.S. Trademark Registration No. 7,026,201 for goods in Class 9;

      e.   U.S. Trademark Registration No. 6,873,252 for goods in Class 9;

      f.   U.S. Trademark Registration No. 6,421,553 for goods in Class 28;

      g.   U.S. Trademark Registration No. 6,521,784 for goods in Class 25;

      h.   U.S. Trademark Registration No. 7,108,181 for goods in Class 25;

     i.   U.S. Trademark Registration No. 7,108,182 for goods in Class 28;

     j.   U.S. Trademark Registration No. 5,918,526 for goods and services in Classes 9 and 41;

     k.   U.S. Trademark Registration No. 6,895,835 for goods in Class 3;

     l.   U.S. Trademark Registration No. 6,895,863 for goods in Class 9;

     m.  U.S. Trademark Registration No. 6,563,758 for goods in Class 25;

     n.   U.S. Trademark Registration No. 6,895,688 for goods in Class 25;

     o.   U.S. Trademark Registration No. 6,931,433 for goods in Class 28; and

     p.   U.S. Trademark Registration No. 7,026,202 for goods in Class 9.

52.    Moonbug has several trademarks relating to Moonbug registered with the United States Patent and Trademark Office ("Moonbug Marks"), including:

     a.   U.S. Trademark Registration No. 5,969,910 for goods and services in Classes 9, 18, 25, 28, 38, and 41; and

     b.   U.S. Trademark Registration No. 6,066,368 for goods and services in Classes 9, 18, 25, 28, 38, and 41.

53.    Under Section 5.4.1 of the Tour Agreement, Moonbug is the owner of "all assets, copyrights, scripts, music, trademarks, merchandise, artwork, audio or audio visual recordings (including, without limitation, any and all Recordings) and materials created in connection with this Agreement and CoComelon Shows and CoComelon Tour, or otherwise hereunder and all constituent elements thereof. . . ." (hereinafter "Works for Hire").

54.    Further, under Section 6.8, in the event the Tour Agreement is terminated (for whatever reason), CCM's "License and all rights granted [under the Tour Agreement]

automatically expire … and [CCM] shall have no further entitlement to any revenue earned after the date of such termination except as otherwise provided" in the Tour Agreement.

55.    As of July 31, 2024, the Infringing Website used images of CoComelon characters (including JJ, Family Characters, and Animal Characters) and the CoComelon logo to promote the now defunct CoComelon Tour.  CCM's use of these images infringes on the CoComelon Works and the CoComelon Marks.  The use of these images further gives the public the false impression that CCM is acting on behalf of, with the authority of, and in affiliation with Moonbug.

56.    Further, notwithstanding the termination of the Tour Agreement, CCM has threatened "to proceed with [a] three-legged tour" and "publicly announc[e] the tour."  Such conduct would clearly further infringe on the CoComelon Works, CoComelon Marks, and Moonbug Marks, infringe on Moonbug's rights in the Works for Hire, and falsely suggest to the public that any future CoComelon Tour was sponsored by and approved by Moonbug.

## COUNT I
### Breach of Contract
### (Moonbug against All Defendants)

57.    Moonbug incorporates by reference the preceding paragraphs of this Counterclaim as if fully restated herein.

58.    The Tour Agreement was, at all relevant times, a valid contract between Moonbug, CCM, and S2BN.

59.    Moonbug fully performed its obligations under the Tour Agreement.

60.    Under the Tour Agreement, CCM was obligated to use its "best endeavours" to tour, both domestically and internationally, including by securing venues, advertising, promoting, and selling tickets and merchandise for the CoComelon Tour.  CCM was also

obligated to support the CoComelon Tour with "a minimum weekly marketing spend of not less than ten (10%) percent of the potential Gross Box Office Receipts during each tour run." Further, S2BN agreed to guarantee CCM's performance obligations by signing the Parent Guarantee.

61.     CCM failed to fulfill its contractual obligations relating to the CoComelon Tour.

62.     In the United States, CCM has both failed to honor its contractual obligations to support the CoComelon Tour (including, on information and belief, by failing to provide the required marketing spend) and refused to resume touring despite Moonbug's repeated demands that CCM do so.  CCM also refused to provide Moonbug with assurances that the CoComelon Tour would resume and was unable to timely provide Moonbug with touring plans for a 2024 or 2025 tour, thereby repudiating the Tour Agreement.

63.     Internationally, CCM failed to tour in any country other than Argentina, despite its clear contractual obligations to use its "best endeavours" to begin touring internationally within eighteen (18) months of execution of the Tour Agreement.

64.     As a direct and proximate result of CCM's repudiation and material breaches of the Tour agreement, Moonbug has suffered damages in an amount to be determined at trial. S2BN is liable for the same by virtue of the Parent Guarantee.

## <u>COUNT II</u>
**Breach of Implied Covenant of Good Faith and Fair Dealing, Pled in the Alternative to Count I**
**(Moonbug against All Defendants)**

65.     Moonbug incorporates by reference the preceding paragraphs of this Counterclaim as if fully restated herein.

66.     The Tour Agreement is a valid contract between Moonbug, CCM, and S2BN.

67.     Moonbug fully performed its obligations under the Tour Agreement.

68.     Under the Tour Agreement, CCM was obligated to use its "best endeavours" to tour, both domestically and internationally, including by securing venues, advertising, promoting, and selling tickets and merchandise for the CoComelon Tour.  S2BN agreed to guarantee CCM's performance obligations by signing the Parent Guarantee.

69.     Notwithstanding these express provisions in the Tour Agreement, CCM has argued that the Tour Agreement does not actually require CCM to tour at any particular frequency and that CCM instead has discretion to determine how frequently it wants to tour.

70.     Assuming CCM's refusal to tour is not a breach of the Tour Agreement's express terms because the Tour Agreement affords CCM discretion as CCM contends, CCM's refusal to tour is a breach of the implied covenant of good faith and fair dealing that is incorporated into all contracts under New York law.

71.     CCM breached the implied covenant of good faith and fair dealing by refusing to resume touring despite Moonbug's repeated demands that CCM do so.

72.     As a direct and proximate result of CCM's breach of the implied covenant of good faith and fair dealing, Moonbug has suffered damages in an amount to be determined at trial.  S2BN is liable for the same by virtue of the Parent Guarantee.

<u>**COUNT III**</u>
**Declaratory Relief – Termination of the Tour Agreement**
**(Moonbug against All Defendants)**

73.     Moonbug incorporates by reference the preceding paragraphs of this Counterclaim as if fully restated herein.

74.     An actual and judiciable controversy exists between Moonbug, CCM, and S2BN regarding their rights and obligations under the Tour Agreement.

75.     Pursuant to the Tour Agreement, CCM was required to use its "best endeavours" to produce, promote, present and sell tickets for the CoComelon Tour in all jurisdictions for which CCM had rights.

76.     Despite Moonbug's repeated demands beginning in the Notice of Default that CCM resume touring and provide viable touring plans, CCM refused to do so.

77.     Instead, CCM rebuffed Moonbug's requests for assurances that CCM resume touring by (1) disputing whether it was contractually obligated to tour (2) claiming that Moonbug's purported antecedent material breach excused CCM's performance oblgiations and (3) providing vague and meaningless statements that it would like to resume touring, rather than detailed touring plans.

78.     By refusing to acknowledge its contractual obligations to Moonbug, and invoking an antecedent material breach defense, CCM has repudiated the Tour Agreement and elected to treat it as terminated.

79.     Further, even if CCM had not repudiated the Tour Agreement and treated it as terminated, Moonbug validly exercised its rights to terminate the Tour Agreement due to, among other things, CCM's uncured materials breaches of the Tour Agreement when Moonbug and CCM's failure to "carry on its business or the applicable business activities" specified in the Tour Agreement.

80.     CCM has refused to accept that the Tour Agreement has been terminated. Instead, CCM claims that the Tour Agreement remains in full force and effect.  Moonbug disagrees with the assertion.

81.     Therefore, an actual controversy exists, and a judicial declaration is necessary and appropriate at this time to establish the rights and obligations of the parties under the Tour Agreement.

## COUNT IV
### False Designation of Origin – 15 U.S.C. § 1125(a)
### (Moonbug Parties against All Defendants)

82.     Moonbug Parties incorporate by reference the preceding paragraphs of this Counterclaim as if fully restated herein.

83.     Moonbug Parties are the owners of all right, title and interest in the CoComelon Marks.  Moonbug is the owner of all right, title and interest in the Moonbug Marks.

84.     CCM was previously a license-holder to the CoComelon Marks and Moonbug Marks until the termination of the Tour Agreement, and therefore had actual notice of the Moonbug Parties' exclusive rights in and to the CoComelon Works and the Moonbug Marks. S2BN, as CCM's parent guarantor, covenanted to guarantee CCM's promise in Section 6.8 to cease using the CoComelon Marks and Moonbug Marks upon termination of the Tour Agreement.

85.     The CoComelon Marks and Moonbug Marks are inherently distinctive and/or have acquired distinctiveness.

86.     Defendants knowingly and willfully used on the Infringing Website reproductions of the CoComelon Marks and Moonbug Marks in order to promote the CoComelon Tour with the intent to cause confusion, to cause mistake and to deceive the purchasing public into believing, in error, that the CoComelon Tour is authorized, sponsored, approved, endorsed or licensed by Moonbug Parties and/or that Defendants are affiliated, connected or associated with Moonbug Parties, thereby creating a likelihood of confusion by consumers as to the source of the CoComelon Tour, and allowing Defendants to capitalize on the goodwill associated with, and the

consumer recognition of, the CoComelon Marks and the Moonbug Marks to Defendants' substantial profit in blatant disregard of Moonbug Parties' rights.

87.     By using reproductions of the CoComelon Marks and Moonbug Marks on the Infringing Website, Defendants have traded off the extensive goodwill of the Moonbug Parties and the CoComelon brand and, on information and belief, did in fact induce, and intend to, and/or will induce customers to purchase Defendants' products and/or services thereby directly and unfairly competing with the Moonbug Parties.  On information and belief, such conduct has permitted and/or will permit Defendants to make sales and profits based on the goodwill and reputation of the Moonbug Parties and the CoComelon brand, which the Moonbug Parties have amassed through its nationwide marketing, advertising, sales and consumer recognition.

88.     Defendants knew, or by the exercise of reasonable care should have known, that their adoption and commencement of and continuing use in commerce of reproductions of the CoComelon Marks and Moonbug Marks would cause confusion, mistake, or deception among purchasers, users, and the public.

89.     Upon information and belief, Defendants' aforementioned wrongful actions have been knowing, deliberate, willful, intended to cause confusion, to cause mistake and to deceive the purchasing public and with the intent to trade on the goodwill and reputation of the Moonbug Parties, the CoComelon brand, the CoComelon Marks, and the Moonbug Marks.

90.     As a direct and proximate result of Defendants' aforementioned actions, Defendants have caused irreparable injury to the Moonbug Parties by depriving them of the value of their marks as commercial assets in an amount as yet unknown, but to be determined at trial, for which it has no adequate remedy at law, and unless immediately restrained, Defendants

will continue to cause substantial and irreparable injury to Plaintiffs and the goodwill and reputation associated with the value of the marks.

91.    Based on Defendants' wrongful conduct, the Moonbug Parties are entitled to injunctive relief as well as monetary damages and other remedies as provided by the Lanham Act, including damages that the Moonbug Parties have sustained and will sustain as a result of Defendants' illegal and infringing actions as alleged herein, and all gains, profits and advantages obtained by Defendants as a result thereof, enhanced discretionary damages and reasonable attorneys' fees and costs.

### COUNT V
### Copyright Infringement – 17 U.S.C. § 501(a)
### (Moonbug Parties against All Defendants)

92.    Moonbug Parties incorporate by reference the preceding paragraphs of this Counterclaim as if fully restated herein.

93.    Moonbug Parties are the exclusive owners of the CoComelon Works.

94.    CCM was previously license-holders to the CoComelon Works until the termination of the Tour Agreement, and therefore had actual notice of the Moonbug Parties' exclusive rights in and to the CoComelon Works.   S2BN, as CCM's parent guarantor, covenanted to guarantee CCM's promise in Section 6.8 to cease using the CoComelon Marks and Moonbug Marks upon termination of the Tour Agreement.

95.    Without permission, Defendants knowingly and intentionally reproduced, copied, and displayed the CoComelon Works on the Infringing Website.

96.    Defendants' unlawful and willful actions as alleged herein constitute infringement of the CoComelon Works, including the Moonbug Parties' exclusive rights to reproduce, distribute, and/or sell such CoComelon Works in violation of 17 U.S.C. § 501(a).

97.    Defendants' knowing and intentional copyright infringement, as alleged herein, has caused substantial and irreparable harm to the Moonbug Parties in an amount presently unknown but to be proven at trial, for which the Moonbug Parties have no adequate remedy at law, and unless enjoined, Defendants will continue to cause substantial and irreparable harm to the Moonbug Parties.

98.    Based on Defendants' wrongful conduct, the Moonbug Parties are entitled to injunctive relief, the Moonbug Parties' actual damages and Defendants' profits in an amount to be proven at trial and enhanced discretionary damages for willful copyright infringement, and reasonable attorneys' fees and costs.

**COUNT VI**
**Unfair Competition**
**(Moonbug Parties against All Defendants)**

99.    Moonbug Parties incorporate by reference the preceding paragraphs of this Counterclaim as if fully restated herein.

100.    By using reproductions of the CoComelon Works, CoComelon Marks, and Moonbug Marks on the Infringing Website, Defendants have traded off the extensive goodwill of the Moonbug Parties and the CoComelon brand to induce, and, on information and belief, did induce and intend and/or will induce, customers to purchase their good and/or services, thereby directly competing with the Moonbug Parties.  On information and belief, such conduct has permitted and will continue to permit Defendants to make substantial sales and profits based on the goodwill and reputation of the Moonbug Parties and the CoComelon brand, which the Moonbug Parties have amassed through its nationwide marketing, advertising, sales, and consumer recognition.

101.    Defendants' advertising, marketing, promoting, distributing, displaying, offering for sale, selling and/or otherwise using the CoComelon Works, CoComelon Marks, and

Moonbug Marks on the Infringing Website was and is in violation and derogation of the Moonbug Parties' rights and is likely to cause confusion and mistake, and to deceive consumers and the public as to the source, origin, sponsorship, or quality of Defendants' goods and services.

102.    Defendants knew, or by the exercise of reasonable care should have known, that their advertising, marketing, promoting, distributing, displaying, offering for sale, selling and/or otherwise using the CoComelon Works, CoComelon Marks, and Moonbug Marks on the Infringing Website and their continuing advertising, marketing, promoting, distributing, displaying, offering for sale, selling and/or otherwise using the CoComelon Works, CoComelon Marks, and Moonbug Marks on the Infringing Website would cause confusion and mistake, or deceive purchasers, users and the public.

103.    Upon information and belief, Defendants' aforementioned wrongful actions have been knowing, deliberate, willful, and intended to cause confusion and mistake and to deceive, in blatant disregard of the Moonbug Parties' rights, and for the wrongful purpose of injuring the Moonbug Parties, and its competitive position while benefiting Defendants.

104.    As a direct and proximate result of Defendants' aforementioned wrongful actions, the Moonbug Parties have been and will continue to be deprived of the benefits of the CoComelon brand in an amount as yet unknown but to be determined at trial, for which the Moonbug Parties have no adequate remedy at law, and the Moonbug Parties have been and will continue to be deprived of the value of the CoComelon Works, CoComelon Marks, and Moonbug Marks as commercial assets in an amount as yet unknown but to be determined at trial, for which the Moonbug Parties have no adequate remedy at law.

105.    As a result of Defendants' actions alleged herein, the Moonbug Parties are entitled to injunctive relief, an order granting the Moonbug Parties' damages and Defendants'

profits stemming from their infringing activities, and exemplary or punitive damages for Defendants' intentional misconduct.

## PRAYER FOR RELIEF

**WHEREFORE**, the Moonbug Parties respectfully request that the Court enter a judgment in their favor and against CCM as follows:

1. An award of compensatory damages against Defendants in an amount to be established at trial but in excess of $75,000.

2. An award of actual damages and Defendants' profits pursuant to 15 U.S.C. § 1117(a).

3. An award of treble damages pursuant to 15 U.S.C § 1117(a).

4. An award of actual damages and Defendants' profits pursuant to 17 U.S.C. § 504(b), or in the alternative, statutory damages of up to $150,000 per infringement pursuant to 17 U.S.C. § 504(c), which the Moonbug Parties may elect prior to the rendering of final judgment;

5. An award of consequential damages, including, but not limited to, Moonbug's lost profits from royalties and merchandising and sponsorship revenue.

6. Declaratory judgment that the Tour Agreement has terminated.

7. Pre- and post-judgment interest on all amounts awarded.

8. A preliminary and permanent injunction enjoining and prohibiting Defendants from directly or indirectly infringing in any manner the CoComelon Works, CoComelon Marks, and Moonbug Marks.

9. For an award of exemplary or punitive damages in an amount to be determined by the Court.

10.    Reasonable attorneys' fees.

11.    An award of costs.

12.    Such other or further relief as this Court deems just and proper.

Dated:  New York, New York

September 20, 2024

Respectfully submitted,

REED SMITH LLP

*/s/ Kasey J. Curtis*
Jordan Siev
Charles P. Hyun
599 Lexington Avenue
22nd Floor
New York, NY 10022
Tel. (212) 549-0375
Fax. (212) 521-5450
jsiev@reedsmith.com
chyun@reedsmith.com

Kasey J. Curtis (*admitted pro hac vice*)
355 South Grand Avenue
Suite 2900
Los Angeles, CA 90071
Tel: (213) 457-8000
Fax: (213) 457-8080
kcurtis@reedsmith.com

*Counsel for Defendant/Counterclaim
Plaintiff Moonbug Entertainment Limited
and Counterclaim Plaintiff Treasure Studio
Inc.*