UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

CCM TOURING LLC,

                      Plaintiff,

           -against-

MOONBUG ENTERTAINMENT LTD.,

                    Defendant.

----------------------------------------------------------------X

        23-CV-7116 (VSB) (VF)

        **OPINION & ORDER**

**VALERIE FIGUEREDO, United States Magistrate Judge**

      In this breach-of-contract suit stemming from an exclusive license to present a live touring show of the popular children's show, CoComelon, there are two motions to exclude expert testimony as inadmissible under Federal Rule of Evidence 702 pending before the Court. Plaintiff/Counterclaim Defendant CCM Touring LLC ("CCM") and Counterclaim Defendant S2BN Entertainment Corporation ("S2BN") (collectively, the "CCM Parties") move to exclude the opinions and testimony of Eric Grilly ("Grilly") and George Wade ("Wade"), experts for Defendant/Counterclaimant Moonbug Entertainment Ltd. ("Moonbug" or "Defendant") and Counterclaimant Treasure Studio Inc. ("Treasure Studio") (collectively, the "Moonbug Parties"). ECF No. 167. For the reasons explained in Part I of this opinion, the CCM Parties' motion is **GRANTED in part** and **DENIED in part**. See infra pp. 7-32. The Moonbug Parties also move to exclude certain opinions and testimony of Michael Olsen ("Olsen") and Felix Barrett ("Barrett"), experts for the CCM Parties. ECF No. 170. For the reasons explained in Part II of this opinion, the Moonbug Parties' motion is **GRANTED in part** and **DENIED in part**. See infra pp. 32-52.

1

## BACKGROUND[1]

This case concerns the contractual rights surrounding live touring performances based upon CoComelon, which at time of the complaint's filing, was the most streamed children's entertainment show in the world. ECF No. 32 at ¶¶ 19-22, 28. Defendant Moonbug is a global children's media company that acquired all the intellectual property rights to CoComelon in 2020. Id. at ¶ 13. On February 5, 2021, CCM and Moonbug executed a contract titled "Exclusive Live Tour and Merchandise Services and License Agreement" (hereinafter, the "CoComelon Live Agreement"), which granted a license to CCM "with respect to the production, promotion, and presentation of live touring shows . . . based upon the animated series known as CoComelon" on a "sole and exclusive basis." ECF No. 127-1 at Preamble; id. at ¶ 1.2.[2] The CoComelon Live Agreement reserved for Moonbug the right to "exploit non-ticketed costume character promotional appearances outside of the CoComelon Tour[.]" Id. at ¶ 1.6.

On December 4, 2021, CCM kicked off in New York the CoComelon Live! JJ's Journey ("CoComelon Live") tour, triggering the beginning of CCM's four-year exclusivity period in the United States, under the CoComelon Live Agreement. ECF No. 32 at ¶¶ 39-41. On June 22, 2023, Moonbug informed CCM that it would be partnering with a different company, Faculty Productions, LLC ("Faculty"), to launch a "slate of marketing appearances" featuring CoComelon characters titled "CoComelon Party Time." Id. at ¶¶ 3, 44, 46; see also ECF No. 32-2. In June of 2023, Moonbug announced the launch of CoComelon Party Time in Atlanta,

---

[1] The Court presumes the parties' familiarity with the factual and procedural background of this case, as set out in the March 28, 2025 opinion of the Honorable Vernon S. Broderick. See ECF No. 107. The background recounted herein is limited to that which is relevant to the instant Daubert motions.

[2] The page numbers referenced herein for citations to the electronic docket ("ECF") are to the ECF-generated pagination in the cited document.

Georgia and after its initial launch in Atlanta, brought CoComelon Party Time to at least nine other American cities. Id. at ¶¶ 47, 52. CCM toured CoComelon Live in Argentina in July 2023 and began planning a Canadian tour to begin in the fall of 2023. ECF No. 107 at 3.

On July 6, 2023, Moonbug issued a press release, stating that CoComelon Party Time was set "to visit all of our friends in Canada." Id. at 4. On July 13, 2023, CCM sent a cease-and-desist letter to Moonbug, informing them that CCM believed that CoComelon Party Time had infringed on CCM's exclusive rights under the CoComelon Live Agreement. Id.; see also ECF No. 32 at ¶ 63; ECF No. 32-7. Moonbug "announced its intention to forge ahead" with the Canadian tour of CoComelon Party Time. ECF No. 32 at ¶ 64. CCM's Canadian touring partner subsequently pulled out of the Canadian CoComelon Live tour, and the Canadian CoComelon Live tour was cancelled as a result. Id. at ¶¶ 55, 65.

On August 11, 2023, CCM commenced the instant lawsuit against Moonbug for a breach of the CoComelon Live Agreement related to Moonbug allowing Faculty to launch CoComelon Party Time. ECF No. 1. On July 24, 2024, CCM filed an amended complaint, asserting a breach of contract claim against Moonbug for "willful, material breaches" of the CoComelon Live Agreement on at least five grounds including, inter alia, "willfully granting CCM's exclusive rights to third parties" and "working with third parties to produce, promote, market and exploit competing CoComelon tours . . . during CCM's exclusive license period," and a claim for declaratory relief in the form a "judgment decreeing, among other things, that [CCM] is entitled to tour CoComelon Live[.]" See ECF No. 32 at ¶¶ 77-89. On August 7, 2024, the Moonbug Parties filed counterclaims against the CCM Parties. See ECF No. 36 at ¶¶ 58-107. On September 20, 2024, the Moonbug Parties filed amended counterclaims against the CCM Parties for breach of contract, breach of the implied covenant of good faith and fair dealing, declaratory

3

relief in the form of termination of the CoComelon Live Agreement, false designation of origin, copyright infringement, and unfair competition. See ECF No. 43 at ¶¶ 57-105.

On June 26, 2025, the CCM Parties filed the instant motion to exclude the expert opinions and testimony of Grilly and Wade. See ECF No. 167; see also ECF Nos. 177-1, 177-2, 177-4, 177-5. That same day, the Moonbug Parties filed the instant motion to strike certain opinions of Olsen and Barrett in their respective expert reports. ECF No. 170; see also ECF Nos. 176-1, 176-2, 176-3. The Moonbug Parties filed their brief in opposition to the CCM Parties' motion on July 15, 2025 (ECF No. 181), and the CCM Parties filed their reply brief in further support of their motion on August 1, 2025 (ECF No. 196).[3] The CCM Parties also filed their brief in opposition to the Moonbug Parties' motion on July 15, 2025 (ECF No. 186), and the Moonbug Parties filed their reply brief in further support of their motion on August 1, 2025 (ECF No. 192). The Court held oral argument on the CCM Parties' motion on February 25, 2026. See ECF Nos. 202, 206.

## LEGAL STANDARD

Under Rule 702 of the Federal Rules of Evidence, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education" may testify regarding an area of specialized knowledge provided that "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

---

[3] On August 8, 2025, the Moonbug Parties filed a letter motion (ECF No. 198), seeking to strike portions of the declaration and an accompanying exhibit submitted by the CCM Parties with their reply brief in further support of their Daubert motion (see ECF Nos. 197, 197-1). On August 22, 2025, the CCM Parties filed a letter motion in opposition. ECF No. 199. Because the Court has not relied on or even referenced the objected-to materials in evaluating the instant Daubert motions, the motion to strike is denied as moot. See Long v. Stellantis N.V., No. 24-CV-6196 (VEC), 2026 WL 710406, at *11 (S.D.N.Y. Mar. 13, 2026) (denying motion to strike as moot "[b]ecause the Court did not rely on any of the exhibits that Plaintiff moved to strike in rendering [its] decision").

(b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. The proponent of expert testimony must establish its admissibility under this rule by a preponderance of the evidence, although "the district court is the ultimate gatekeeper." United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007) (internal quotation marks and citation omitted).

An expert's opinion must have "a reliable basis in the knowledge and experience of his discipline." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 592 (1993). In general, a court should consider "the extent to which the expert's theory has been subjected to peer review and publication, whether the technique is subject to standards controlling the technique's operation, the known or potential rate of error, and the degree of acceptance within the relevant scientific community." United States v. Ulbricht, 858 F.3d 71, 116 n.50 (2d Cir. 2017) (internal quotation marks, alteration, and citation omitted). This "Daubert reliability assessment" is a "flexible" inquiry, however, and "Daubert is not a definitive checklist or test for the reliability of expert testimony." Id. (internal quotation marks and citations omitted). "[W]hether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the [court] broad latitude to determine." Id. (citation omitted).

There is no requirement that all expert testimony express opinions or conclusions that have been "established to a degree of scientific certainty." Restivo v. Hessemann, 846 F.3d 547, 577 (2d Cir. 2017). All experts, including "economists[,] may express professional opinions that fall short of definitive proof" as long as their "testimony [is] reliable under Rule 702[.]" Id. at 576 (citation omitted). Instead, a court must "assess whether the expert employs the same level

of intellectual rigor that characterizes the practice of an expert in the relevant field[.]" Id. at 577 (citation omitted).

As the Second Circuit has recognized, "Daubert reinforces the idea that there should be a presumption of admissibility of evidence." Borawick v. Shay, 68 F.3d 597, 610 (2d Cir. 1995). Rule 702 "embodies a liberal standard of admissibility for expert opinions[.]" Nimely v. City of New York, 414 F.3d 381, 395 (2d Cir. 2005). "[T]he rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note; accord Equal Employment Opportunity Comm'n v. Morgan Stanley & Co., 324 F. Supp. 2d 451, 456 (S.D.N.Y. 2004).

However, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002); accord Ruggiero v. Warner–Lambert Co., 424 F.3d 249, 253 (2d Cir. 2005). Expert testimony admitted under Rule 702 must be relevant and rest on a reliable foundation. Daubert, 509 U.S. at 597. When evaluating the reliability of expert testimony, "it is critical that an expert's analysis be reliable at every step." Amorgianos, 303 F.3d at 267. "[A]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible." Id. (emphasis omitted).

"[A] trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith." Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 213-14 (2d Cir. 2009) (internal quotation marks and citation omitted). "[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data

6

only by the ipse dixit of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997). A

contention that an expert's assumptions are unfounded, however, may "go to the weight, not the

admissibility, of the testimony." Restivo, 846 F.3d at 577 (citation omitted). "A minor flaw in an

expert's reasoning or a slight modification of an otherwise reliable method" does not itself

require exclusion; exclusion is only warranted "if the flaw is large enough that the expert lacks

good grounds for his or her conclusions." Amorgianos, 303 F.3d at 267 (internal quotation marks

and citation omitted). This is because "our adversary system provides the necessary tools for

challenging reliable, albeit debatable, expert testimony." Id. "[V]igorous cross-examination,

presentation of contrary evidence, and careful instruction on the burden of proof are the

traditional and appropriate means of attacking shaky but admissible evidence." Id. (quoting

Daubert, 509 U.S. at 596).

**DISCUSSION**

I.    **The CCM Parties' Daubert Motion**

   A. Eric Grilly

      *1.  Grilly's expert report*

Grilly is a live entertainment executive who has worked in the live entertainment industry

for over 20 years and specifically in live family entertainment and touring for over 15 years. ECF

No. 177-1 at ¶ 3, see also id. at Ex. A. He was retained by Moonbug to opine on "(1) what

constitutes best endeavors in live touring of family shows and whether [the CCM Parties] used

best endeavors to tour [CoComelon Live]; (2) why CoComelon Live failed to successfully tour;

and (3) the additional royalties that Moonbug would have likely earned had S2BN used its best

endeavors to tour CoComelon Live." Id. at ¶ 1.

Grilly opines that CCM did not use "best endeavors" to tour CoComelon Live because CCM took "long breaks from touring" and CCM did not have a "comprehensive, ongoing touring plan like those developed by [CCM] and Round Room in their respective business plans." Id. at ¶¶ 33, 36. Grilly states that the CoComelon Live Tour ran for six performances across two cities in 2021 and ran for two legs for 74 performances in 2022. Id. at ¶¶ 46-47. In July of 2023, CoComelon Live launched in Argentina and "ran for a few weeks with nominal ticket sales" but did not tour anywhere outside of Argentina. Id. at ¶ 48. CoComelon Live did not tour in 2024. Id. at ¶ 49.

According to Grilly, "best endeavors to tour an international live theatrical show focused on the pre-school demographic over a four-year time period requires the promoter to tour annually (or nearly annually), including putting on a tour annually within the United State[s]." Id. at ¶ 37. He opines that "larger-scale productions with strong [intellectual property] benefit from longer engagements in key cities, as this reduces logistical expenses while capitalizing on larger markets' ability to sustain higher attendance over multiple performances," and "[s]maller productions, in contrast, thrive on a more frequent, city-hopping model to penetrate a broader range of markets effectively." Id. at ¶ 42. As it concerns CoComelon Live, Grilly explains that to optimize a larger production, CCM needed "to put on the show between 40-45 weeks per year, 1 to 2 cities in a week, with 1.5 shows on weekdays and 4 to 7 shows on weekend." Id. at ¶ 43. And to optimize a smaller production of CoComelon Live, Grilly states that CCM needed "to run the Tour between 40-45 weeks per year, 4 to 5 cities a week, with 1.5 shows per city."[4] Id. Grilly states that CCM's efforts to tour CoComelon Live between 2021 and 2024 "fell far below the

---

[4] Grilly also states that "[a]lmost no family shows (even those based on very popular [intellectual property]) tour anything close to 45 weeks or put on 337 shows each year." ECF No. 177-1 at ¶ 70.

threshold of what constitutes an optimal touring schedule, and the touring plan that [CCM] employed did not align with best practices." Id. at ¶ 50.

Grilly further opined that CoComelon Live stopped touring because the tour's operational expenses were too high and CCM failed to appropriately address and mitigate those costs. Id. at ¶ 51. Grilly explains that based on CCM's March 2021 business plan and projections, CoComelon Live could have made a profit if it sold at least 56% of its tickets, a figure known as the breakeven percentage. Id. at ¶ 52. Relying on ticket counts from the first three legs of the tour, Grilly states that 10,627 tickets were sold during the first leg of the CoComelon Live tour, out of a capacity of 15,208 (representing 69.87%); 16,462 tickets were sold during the second leg of the CoComelon Live tour, out of a capacity of 25,466 (representing 64.64%); and 110,271 tickets were sold during the third leg, out of a capacity of 171,018 (representing 64.47%). Id. at ¶ 55. Grilly states that the tour's "64-70% sell through percentage" was "sufficient to make it a viable show," noting that "[he] ha[s] had productions make money with sell through percentages as low as 50%." Id. at ¶ 57. He opines that had CoComelon Live "held to the 56% breakeven percentage" that CCM projected, CCM would have been able "to turn a profit on Legs 1-3 of CoComelon Live." Id.

According to Grilly, CoComelon Live did not make a profit, preventing it from touring in 2023 and 2024, "because its operational costs were exceedingly high and significantly departed from [CCM]'s original projections." Id. at ¶ 58. CCM's March 2021 business plan reflects projected weekly operating costs for CoComelon Live of $130,000, which Grilly states "are high weekly operating costs, but expenses that still worked under [CCM]'s business plan for CoComelon Live." Id. at ¶ 54. However, CoComelon Live's actual weekly operating costs were "over $200,000 for Leg 1, $194,000 for Leg 2, and $165,000 for Leg 3," which Grilly states,

9

based on his experience, are "extremely high weekly operating costs." Id. at ¶ 59. And Grilly surmises that because of these operating costs, CoComelon Live had an operating loss of "more than $700,000 for Leg 1, $300,000 for Leg 2, and $1,200,000 for Leg 3." Id. According to Grilly, CoComelon Live failed because of the high operating costs. Id. at ¶ 60.

Finally, Grilly opined that if CCM had appropriately utilized its best endeavors to tour, Moonbug would have earned an additional royalty of between $600,020.80 and $6,492,284.72 for 2021 to 2024, and between $1,499,849.08 and $10,209,613.18 for 2021-2025. Id. at ¶¶ 64, 73. Both CCM and non-party Round Room created financial modeling to project the financial success of the CoComelon Live tour. Id. at ¶ 65. Under Round Room's model, which Moonbug received "as part of Round Room's pitch," Round Room projected "6 touring weeks and 42 shows in 2021, 18 touring weeks and 126 shows in 2022, 16 touring weeks and 112 shows in 2023, 18 touring weeks and 126 shows in 2024, and 18 touring weeks and 126 shows in 2025." Id. at ¶¶ 65-66. CCM's model, which it used in its March 2021 business plan, projected "45 touring weeks and 337.5 shows every year in 2022-2025." Id. at ¶ 66. Both models assumed similar ticket prices, projected merchandise revenue, and a 70% sell through rate on tickets. Id. at ¶¶ 65-66. CCM's model also included "a revenue boost for VIP experiences of approximately $3.5 - $4.5/ticket sold[.]" Id. at ¶ 66. Grilly described Round Room's model as "a reasonable and conservative estimate of how CoComelon Live would have performed had [CCM] competently utilized its best endeavors to tour," noting that the projections were "more realistic and reflective of the current market opportunity for the [intellectual property] as submitted in 2020." Id. at ¶¶ 67-68. As it concerns CCM's projections, Grilly opined that they were "unrealistic" and "speculative" because "[a]lmost no family shows (even those based on very popular [intellectual property]) tour anything close to 45 weeks or put on 337 shows each year." Id. at ¶¶ 35, 70, 74.

In reaching his opinion as to the amount of Moonbug's lost royalty revenue from CCM's failure to tour CoComelon Live, Grilly used the "median" of the Round Room and CCM projections. Id. at ¶ 74. That median figure is $3,546,152.7614 for 2021-2024 and $5,854,731.13 for 2021-2025. Id.

2. *The CCM Parties' criticisms of Grilly's expert report.*

First, the CCM Parties argue that Grilly's opinion as to Moonbug's lost royalty revenues is actually a "lost profits" opinion that should be excluded because it "improperly relies on speculative financial projections instead of the actual financial performance of two live CoComelon tours." See ECF No. 173 at 9-14 (emphasis omitted). The Moonbug Parties respond that "Moonbug was not paid based upon CCM's 'profits'"; the royalty to Moonbug "was based upon gross ticket sales and has nothing to do with the profitability of CoComelon Live." ECF No. 181 at 15-16 (emphasis omitted). Grilly's reliance on projections to calculate lost royalties, the Moonbug Parties contend, is a basis for cross-examination, not exclusion of his opinion. Id. at 17-19.

For the reasons discussed herein, whether described as a lost profits or lost royalties opinion, Grilly based his opinion on financial projections created by others, which he did not independently verify in the context of projecting future earnings for a new business venture. This is contrary to controlling case law concerning the calculation of damages and thus requires exclusion of this aspect of Grilly's opinion. See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig., No. 14-MD-2542 (VSB), 2025 WL 354671, at *50 (S.D.N.Y. Jan. 30, 2025) ("Expert opinions that conflict with controlling law are not helpful to the jury.") (citation omitted); Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc., No. 11-CV-6201 (DLC), 2015 WL 640875, at *3 (S.D.N.Y. Feb. 16, 2015) (quoting Fed. R. Evid. 702) (excluding expert's

11

damages calculation because the calculation was based on interpretation of a statute that was "incorrect as a matter of law, and conclusions drawn therefrom cannot 'help the trier of fact . . . to determine a fact in issue'").

As an initial matter, Grilly's opinion does appear to concern CCM's lost profits. The CCM Parties contend that Grilly opines on lost profits because "Moonbug's entitlement to any additional royalties is premised on a percentage of CoComelon Live's net revenues[.]" ECF No. 173 at 9. This argument is supported by the CoComelon Live Agreement.

Under the agreement, CCM was required to fund a "non-recoupable i) initial production budget of not less than [$1,650,000] and up to [$2,000,000] for the first run of the [CoComelon Live] and ii) to a minimum weekly marketing spend of not less than ten (10%) percent of the potential Gross Box Office Receipts during each tour run hereunder." ECF No. 127-1 at ¶ 4.1. CCM was also required to pay Moonbug a recoupable, non-refundable advance against royalties in the amount of $2,000,000. Id. at ¶ 4. In addition, CCM was obligated to pay Moonbug certain "Royalties" based on percentages of "Net Gross Box Office Receipts," and "Net Gross Merchandise Revenue." Id. at ¶ 4.2. Those Royalties, however, were not payable until CCM recouped the $2,000,000 advance paid to Moonbug. Id. (stating that the payment of royalties was "[s]ubject to and upon recoupment of the Advance"). Moonbug thus was entitled to royalties only if CoComelon Live was sufficiently profitable for CCM to recoup the $2,000,000 advance. In other words, if CoComelon Live lost money, Moonbug would have received no royalties under the agreement. See ECF No. 177-8 at 4 (expert Susan Vargo testifying that if CCM used its best endeavors "but lost money, Moonbug would not have earned any additional royalty revenue").

"[T]o recover damages for lost earnings or profits one . . . must prove with reasonable certainty, though not mathematical precision, the amount of the loss." Hodnett v. Medalist Partners Opportunity Master Fund II-A, L.P., No. 21-CV-38 (JLR), 2025 WL 2607548, at *28 (S.D.N.Y. Sept. 9, 2025) (citation omitted). "Projections of future profits based upon a multitude of assumptions that require speculation and conjecture and few known factors do not provide the requisite certainty." Id. (internal quotation marks and citations omitted). Further, "evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate." Schonfeld v. Hilliard, 218 F.3d 164, 172 (2d Cir. 2000) (citing Kenford Co. v. Cnty. of Erie, 67 N.Y.2d 257, 261 (1986)). Where lost profits "are at issue, 'an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding' a party's future prospects." Supply & Bldg. Co. v. Estee Lauder Int'l, Inc., No. 95-CV-8136 (RCC), 2001 WL 1602976, at *4 (S.D.N.Y. Dec. 14, 2001) (quoting Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996)).

Here, Grilly's calculation of the additional royalties Moonbug would have received had CCM continued to tour is based entirely on financial projections. He used the financial projections prepared by CCM and Round Room sometime in 2020 and 2021 and then applied the royalty percentages contained in the agreement to those projections. ECF No. 177-1 at ¶¶ 52, 65, 72-73; ECF No. 173 at 5 (stating that the projections were prepared in 2020-2021). Although Grilly testified that the projections "were based upon a number of different assumptions that [CCM] and Round Room made," Grilly did not independently verify the assumptions.[5] ECF No.

---

[5] Additionally, Grilly made his own assumption regarding Round Room's projections, stating: "I also assume that Round Room was envisioning a revamp of CoComelon Live during the 2021-2025 period to avoid the deterioration I would otherwise expect if the same show were to run for four years." ECF No. 177-1 at ¶ 69.

13

173 at 14 (alterations in original); see also ECF No. 177-3 at 9. Grilly could have, for example, tested the accuracy of the projections by comparing them to the actual performance of another live family show, or he could have interviewed the individuals "who played a pivotal role in preparing the projections" in order to understand the assumptions made by those individuals in preparing the projections. See Hodnett, 2025 WL 2607548, at *29. He did none of those things. As the court recognized in Hodnett v. Medalist Partners Opportunity Master Fund II-A, L.P., an expert's methodology is "flawed" where the expert calculated lost profits by relying on projections whose underlying assumptions the expert did not "independently verify." Id.; see also Holland Loader Co., LLC v. FLSmidth A/S, 313 F. Supp. 3d 447, 481 (S.D.N.Y. 2018), aff'd by, 769 F. App'x 40 (2d Cir. 2019) ("A company without past sales can prove lost profits by identifying a comparable company and analyzing that company's actual profit history.") (citation omitted).

Further, at the time the projections were prepared, there had not yet been any shows of CoComelon Live. ECF No. 173 at 12; ECF No. 177-1 at ¶¶ 46-48, 52, 65. And although there had been two CoComelon tours by the time Grilly prepared his report, both tours had lost money. See, e.g., ECF No. 177-1 at ¶ 34. Grilly did not use the financial figures from the past tours in projecting lost royalties, relying instead on pre-tour projections. See id. at ¶¶ 35, 52, 65, 70, 74. Grilly described one set of projections as "unrealistic" and "speculative," because "[a]lmost no family shows (even those based on very popular [intellectual property]) tour anything close to 45 weeks or put on 337 shows each year," and he described the other set as "conservative." ECF No. 177-1 at ¶¶ 35, 67, 70, 74. He nevertheless sought to "extrapolate damages for an unproven business" based on projections that were grounded on underlying assumptions about touring frequency that he did not agree with and did not verify. See Hodnett, 2025 WL 2607548, at *28-

14

Case 1:23-cv-07116-VSB-VF    Document 208    Filed 03/27/26    Page 15 of 53

29, 29 n.1 (concluding that party had not established lost profits with reasonable certainty where calculations were based on projections and business was "unproven," "selling a novel product, in yet untapped markets").

Equally problematic for Grilly's analysis is that CoComelon Live was a new venture. CoComelon Live was the first ever CoComelon live tour, making it a new venture for the CCM Parties. See Schonfeld, 218 F.3d at 173 (explaining that a new kind of television channel was still a "new business" for defendants even though they "were experienced cable channel operators and [their other] news programming ha[d] been distributed around the world for many years"); The Upper Deck Co., LLC v. Breakey Int'l, BV, 390 F. Supp. 2d 355, 360 (S.D.N.Y. 2005) (explaining that even though plaintiff was "an experienced player in the collectible toy market, this is a new entertainment product that has never before been sold in thirty-five of the thirty-seven countries for which [the expert] projects sales") (internal quotation marks and citation omitted). Under New York law, "evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate." InspiRx, Inc. v. Lupin Atlantis Holdings SA, 554 F. Supp. 3d 542, 563 (S.D.N.Y. 2021) (quoting Schonfeld, 218 F.3d at 172). And as courts in this District have explained, "lost profits calculations for new ventures that rest on a series of assumptions and projections are generally unreliable" and "must be judged with special scrutiny." Ho Myung Moolsan, Co. v. Manitou Min. Water, Inc., No. 07-CV-7483 (RJH), 2010 WL 4892646, at *7-8 (S.D.N.Y. Dec. 2, 2010), aff'd by, 501 F. App'x 85 (2d Cir. 2012).

To be sure, an expert's use of assumptions or projections in calculating lost profits is not necessarily fatal, if the assumptions or projections are reliable. See Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp. N.V., 28 F. Supp. 2d 126, 135 (S.D.N.Y. 1998), aff'd by, 205 F.3d

1323 (2d Cir. 1999) (explaining that factors other than projections, "such as the parties' established course of business or the fact that the projections were borne out by actual performance" can make lost profit damages provable with reasonable certainty); Ho Myung Moolsan Co., 2010 WL 4892646, at *9 n.4 (excluding expert report because opinion relied on assumptions that "were entirely unfounded and unreliable, and that [ ] reliance was therefore misplaced"). But, here, Grilly took no steps to independently assess the reliability of the projections prepared by CCM or Round Room, or the assumptions relied on in preparing those projections.

The Moonbug Parties argue that Grilly did rely on actual performance data from the tour because he used the financial performance of CoComelon Live from 2021, 2022, and part of 2023 as a "cross-check." See ECF No. 181 at 18 n.6; see also ECF No. 206 at 10-11 (explaining that Grilly "us[ed] the actuals as a cross-check on [the projections]"); ECF No. 177-1 at ¶ 72 (chart providing Grilly's calculations of lost royalties contains "[a]ctual" figures for 2021, 2022, and 2023). But if this was an aspect of Grilly's methodology, his report provides no explanation of it whatsoever. He does not explain how the actual performance data was used as a "cross check" or even incorporated in his analysis. All that is apparent from Grilly's report is that he included both the actual and projected revenues in a chart that details the royalties for 2021 through 2025. ECF No. 177-1 at ¶ 72.

What's more, the circumstances surrounding preparation of the projections underscore their unreliability. Sometime in 2020 to 2021, both CCM and Round Room "created financial modeling intended to project how successful CoComelon Live could be." ECF No. 177-1 at ¶ 65. Round Room's financial modeling was shared with Moonbug "as part of Round Room's pitch" (ECF No. 177-1 at ¶ 65), and CCM's modeling was used in its March 2021 business plan for

16

CoComelon Live, which was ultimately submitted to another company "to solicit a $5.5 million [

] investment in CoComelon Live" (ECF No. 181 at 18). In assessing lost profits calculations,

courts in this District have explained that documents prepared for the purpose of securing

funding are of "questionable reliance" for establishing damages with reasonably certainty.

Hodnett, 2025 WL 2607548, at *30; Holland Loader Co., LLC, 313 F. Supp. 3d at 481-82

(concluding that plaintiff's expert could not rely on defendant's "internal forecasts" to calculate

lost profits where the forecasts had been "prepared for the purpose of securing . . . funding" and

were not based on historical data); Prepaid Ventures, Ltd. v. Paul Compton, No. 18-CV-2102

(DLI), 2022 WL 18859053, at *20 (E.D.N.Y. Dec. 21, 2022), adopted as modified sub nom. by,

Prepaid Ventures, Ltd. v. Compton, 2023 WL 2662311 (E.D.N.Y. Mar. 28, 2023), aff'd by, No.

23-CV-596, 2025 WL 444643 (2d Cir. Feb. 10, 2025) (observing the "absence of evidence

establishing the reliability of the projections on which the expert based her [lost profits] damages

calculations" where "plaintiffs provide[d] no proof of the reliability of those projections [that

may have been reviewed by defendants or defendants may have had some involvement in

preparing], which may well have been the product of unwarranted optimism and/or outright

exaggeration"). Grilly relied on a set of projections used in a business plan to solicit an

investment in the show. And, significantly, as to both sets of projections, Grilly testified that he

"can't speak" to the assumptions underlying them. ECF No. 173 at 14; ECF No. 177-3 at 9.

Even if Grilly has not offered an opinion on lost profits, the opinion on lost royalties is

still unduly speculative and unreliable.[6] "Under New York law, a plaintiff need not establish

---

[6] At least one court in this District has applied the same "relatively demanding standard" applicable to lost profits opinions, Kidder, Peabody & Co., 28 F. Supp. 2d at 131, to an opinion on lost royalties. See The Upper Deck Co., LLC, 390 F. Supp. 2d at 358-59. Regardless, applying the standard applicable to damages calculations generally, Grilly's opinion is still too speculative for the reasons discussed herein.

damages with precision, but damages 'must be capable of measurement based upon known reliable factors without undue speculation.'" T.E.A.M. Ent., Inc. v. Douglas, No. 04-CV-1552 (JSR), 2006 WL 587326, at *3 (S.D.N.Y. Mar. 9, 2006) (quoting Ashland Mgmt. Inc. v. Janien, 82 N.Y.2d 395, 403 (1993)); see also Inficon, Inc. v. Verionix, Inc., 182 F. Supp. 3d 32, 36 (S.D.N.Y. 2016) (citing Bloor v. Falstaff, 601 F.2d 609, 615 (2d Cir. 1979)) (explaining that "[a]lthough a plaintiff seeking lost royalties or earn-out payments is not required to prove damages with mathematical certainty, the plaintiff is required to provide a reasonable estimate of damages, supported by adequate proof"). In establishing royalties, "a plaintiff must provide a 'stable foundation for a reasonable estimate of royalties [it] would have earned had defendant not breached its promise.'" T.E.A.M. Ent., 2006 WL 587326, at *3 (quoting Freund v. Washington Square Press, Inc., 34 N.Y.2d 379, 383 (1974)) (alteration in original).

Reliance on projections and assumptions may render a lost royalties analysis unreliable where the expert had actual data that he did not use or where he did not independently verify the projections upon which he relied. See Robinson v. Sanctuary Rec. Groups, Ltd., 542 F. Supp. 2d 284, 291-93 (S.D.N.Y. 2008), vacated sub nom. on other grounds by, Robinson v. Sanctuary Music, 383 F. App'x 54 (2d Cir. 2010) (finding expert's damages opinion unreliable where expert failed to conduct an independent royalty audit, only reviewed a limited set of the produced documents, and failed to independently verify certain sales projections, despite having royalty statements reflecting actual sales); Faulkner v. Arista Recs. LLC, 46 F. Supp. 3d 365, 383-84 (S.D.N.Y. 2014) (concluding that expert's royalties analysis was not reliable where expert did not rely on available historical data); T.E.A.M. Ent., Inc., 2006 WL 587326, at *4 (concluding that damages of lost royalties were not proven where expert based analysis on albums released by a different record label and provided no evidence to the jury to evaluate the "plausibility" of

18

the assumption). As discussed, Grilly took no steps to verify the reliability of the projections he used, he could not speak to the assumptions underlying those projections, and he ignored the tour's actual financial results from 2021-2022 (which were negative) in estimating future lost royalties.

At bottom, Grilly's damages calculation is unreliable because he ignored actual financial data from the two years when the tour was live and he did not independently verify the projections he used instead. For these reasons, Grilly's third opinion is inadmissible. See Lightbox Ventures, LLC v. 3rd Home Ltd., No. 16-CV-2379 (DLC), 2017 WL 5312187, at *9-11, 17 (S.D.N.Y. Nov. 13, 2017) (excluding plaintiff's expert reports analyzing valuations and lost profits damages because calculations were based on "unverified information," "optimistic projections," and an unsupported business representation); Vogel v. TakeOne Network Corp., No. 22-CV-3991 (AS), 2025 WL 2732653, at *1, 8 (S.D.N.Y. Sept. 25, 2025) (excluding plaintiff's damages expert who opined on, *inter alia*, lost profits damages) (internal quotation marks and citation omitted).

Next, the CCM Parties attack Grilly's opinion that CCM failed to use its best endeavors to tour CoComelon Live. The CCM Parties argue that the opinion is inadmissible because the CoComelon Live Agreement did not impose an obligation on CCM to use "best endeavors" to tour and thus such expert testimony will confuse the trier of fact. ECF No. 173 at 16-17. But whether the agreement imposed such an obligation is a question that goes to the merits of the Moonbug Parties' counterclaims. See Solid Oak Sketches, LLC v. 2K Games, Inc., 449 F. Supp. 3d 333, 351 (S.D.N.Y. 2020) (denying motion to exclude expert on the grounds that "Plaintiff's disagreement with Defendants' legal positions does not render competent expert testimony consistent with those positions unfairly prejudicial"); BanxCorp v. Costco Wholesale Corp., 978

19

F. Supp. 2d 280, 321 (S.D.N.Y. 2013) ("Plaintiff's mere disagreement with the conclusions of an opposing expert is not sufficient grounds for exclusion of his testimony.").

Grilly opined that CCM failed to tour CoComelon Live consistent with industry practice concerning the frequency of live family entertainment shows. "Experts can offer testimony about standard industry practice." Augenbaum v. Anson Invs. Master Fund LP, No. 22-CV-249 (AS), 2025 WL 2780854, at *11 (S.D.N.Y. Sept. 30, 2025) (citation omitted). And testimony about industry norms and customs in this regard is likely to help a jury evaluate the ultimate issues in the case, not confuse it, because Moonbug contends that the failure of CCM to use its best endeavors to tour—i.e. to tour consistent with industry practice—amounts to a breach of the agreement or a breach of the covenant of good faith and fair dealing. ECF No. 181 at 9; see also ECF No. 43 at ¶¶ 60, 63, 68-71. See United States v. Bilzerian, 926 F.2d 1285, 1295 (2d Cir. 1991) ("[T]estimony concerning the ordinary practices in the securities industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice.") (citation omitted). Grilly's opinion as to the industry's norms and customs for touring cadence and volume are therefore relevant and admissible. See Am. Nat. Fire Ins. Co. v. Mirasco, Inc., 265 F. Supp. 2d 240, 252 (S.D.N.Y. 2003), decision supplemented, reconsideration denied by, No. 00-CV-5098 (RWS), 2003 WL 22271226 (S.D.N.Y. Sept. 30, 2003) (expert's anticipated testimony regarding "the customs and practices in the cargo insurance industry" was "clearly relevant and admissible testimony, as experts may testify as to the customary practices in a profession or industry").

Additionally, the CCM Parties misstate Grilly's testimony when they argue that he opines that CCM breached the best endeavors provision of the CoComelon Live Agreement. See ECF No. 196 at 10. Of course, it is "hornbook law that witnesses, experts, or otherwise, are generally

20

not permitted to render an opinion on whether a party has breached a contract provision." <u>Scavo v. CMA CGM S.A.</u>, No. 16-CV-5479 (ENV) (CLP), 2022 WL 577953, at *2 (E.D.N.Y. Feb. 25, 2022). But Grilly never opines that CCM breached the agreement. Nor does Grilly opine that CCM breached any best endeavors clause in the contract. Instead, Grilly offers testimony about the industry custom for the frequency with which live family shows typically tour and ultimately opines that CCM's touring plan did not align with those industry practices. ECF No. 177-1 at ¶ 50; <u>see</u> <u>Oestreicher v. Flagstar Bank</u>, No. 23-CV-239 (RER) (LKE), 2025 WL 3755609, at *3 (E.D.N.Y. Sept. 29, 2025) (quoting <u>Primavera Familienstifung v. Askin</u>, 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001)) ("[I]t is proper for an expert to testify as to the customs and standards of an industry, and to opine as to how a party's conduct measured up against such standards.") (alteration in original); <u>see also</u> <u>Patriarch Partners Agency Servs., LLC v. Zohar CDO 2003-I, Ltd.</u>, No. 16-CV-4488 (VM), 2025 WL 2592224, at *13 (S.D.N.Y. Sept. 8, 2025) (explaining that "[a]lthough experts may not offer legal conclusions, such as what a contract means or whether a party breached, experts may opine on relevant industry custom as informed by the expert's experience"). Consequently, Grilly's testimony on whether CCM used best endeavors to tour CoComelon Live—as understood in industry parlance—is admissible.

Finally, Grilly opined that CoComelon Live did not make a profit because its operational expenses were too high. ECF No. 177-1 at ¶ 58. Grilly further opined that CoComelon Live "failed" because "operating costs were exceedingly high." <u>Id.</u> at ¶¶ 58-60. The CCM Parties argue that this impermissibly opines on the parties' mental state or subjective intent. ECF No. 173 at 17-18. To be sure, "experts may not offer opinions regarding state of mind, intent, or motive as part of their analysis." <u>AmTrust N. Am., Inc. v. KF&B, Inc.</u>, No. 17-CV-5340 (LJL), 2020 WL 5578675, at *5 (S.D.N.Y. Sept. 16, 2020) (citation omitted). And Moonbug concedes

21

that Grilly "cannot testify" that the high operational costs "is the reason that CCM ultimately stopped touring." ECF No. 181 at 23.

But Grilly has not opined that the high operational costs are the reason CCM *stopped* touring. Instead, Grilly opined that the high operational costs were the reason the tour did not make a profit and was not successful. ECF No. 177-1 at ¶ 34 (explaining that CoComelon Live "failed to successfully tour [ ] because the operational expenses . . . were too high," and CoComelon Live's ticket sales were "sufficient sales to make it financially viable"); id. at ¶ 51 (opining that "CoComelon Live failed because the operational expenses of the tour were too high"); id. at ¶ 59 (observing that CoComelon Live's weekly operating costs were "extremely high" in comparison to most of the family shows Grilly has been involved in). That the tour's operational costs were high and led to financial losses is well within Grilly's area expertise and permissible expert testimony. See Scott v. Chipotle Mexican Grill, Inc., 315 F.R.D. 33, 46 (S.D.N.Y. 2016) (permitting expert to testify about "how Chipotle organizes its operations, whether such structure is typical in the industry, and how choices Chipotle makes affect costs and revenue" because such testimony "will assist the trier of fact in understanding Chipotle's business model" and "may also help explain common business practices related to cost savings"); AU New Haven, LLC v. YKK Corp., No. 15-CV-3411 (GHW) (SN), 2019 WL 1254763, at *25 (S.D.N.Y. Mar. 19, 2019), objections overruled by, 2019 WL 2992016 (S.D.N.Y. July 8, 2019) (permitting expert testimony "that 'but for' [defendant]'s actions, [plaintiff] would have laminated millions more meters of zippers for [defendant]" because "it is not unreasonable for [the expert] to conclude that [defendant] could have maintained sales volume while losing some of its margin to [plaintiff]'s higher lamination costs").

In sum, all of Grilly's opinions are admissible, save for his lost royalties opinion.

22

B. George Wade

    *1. Wade's expert report*

Wade is an expert in the licensing of intellectual property rights, specializing in live entertainment licensing practices, with more than 40 years of experience in the location-based entertainment industry. ECF No. 177-4 at 4-6. He was retained by Moonbug to opine "on various topics related to Location-Based Experiences (LBEs), including whether CoComelon Live!: JJ's Journey (CoComelon Live) and CoComelon Party Time (Party Time) are distinct offerings that implicate different rights and may cannibalize each other's ticket sales." Id. at 4.

In his report, Wade provides a comprehensive historical overview of various types of location-based entertainment, including amusement parks, carnivals, museums, and touring exhibitions. Id. at 8-25, 27-40. He details the historical evolution of live entertainment and explains the distinction between live touring shows and immersive experiences, the characteristics of each, and how they are recognized in the live entertainment industry, using real-world examples involving well-known children's characters like Harry Potter, Peppa Pig, Bluey, and Peanuts. Id.

Wade's "[c]ore [c]onclusion" is that "CoComelon Live and [CoComelon] Party Time are distinct experiences that cater to different audience needs and desires" and that, "[w]ith proper geographical protections and scheduling, these offerings avoid market confusion and can complement each other." Id. at 8. He reaches this conclusion by comparing the two performances and their characteristics, considering industry norms and practices. Id. at 6-8, 18, 24-25.

Wade opines that CCM's CoComelon Live is a "traditional live theatrical show" because (1) it "[f]eatured scripted dialogue, musical performances, stage set changes, and a two-act structure," (2) was "[m]arketed as a passive theatrical experience through traditional media

23

outlets," (3) involved "[m]inimal audience participation, limited to singing or cheering during the performance," (4) included a "VIP surcharge for Character Meet and Greets . . . not available to all ticket purchasers," and (5) "[CCM]'s contract with Moonbug only covered live show rights." Id. at 24. In contrast, he opines that CoComelon Party Time is "an immersive experience," because it (1) was "hosted in non-traditional venues, such as shopping malls," (2) was "[d]esigned to take children inside the colorful world of Co[C]omelon with various interactive activities, including: [g]ames in the Cuddly Corner[,] [c]reative activities in the Activity & Color Center[,] [d]ancing on a light-up dance floor[,] [p]hoto opportunities in immersive environments, including interactions with characters like JJ and Cody[,] [and] [c]haracter [s]ingalong for [c]hildren[,]" (3) was "[a] highly interactive, hands-on attraction for children," and (4) Faculty's license from Moonbug "excluded" "live show rights." Id. at 24-25.

Wade further opines that Moonbug mitigated the risk of confusion between the presence of both CoComelon Live and CoComelon Party Time in the same market at the same time through "routing insulation," specifically territorial blackout dates and geographic protections. Id. at 7, 41. With regard to the territorial blackout dates, Wade explains that Moonbug had agreements that required "[CoComelon] Party Time licensee[s] to avoid scheduling in cities included in CoComelon Live's touring schedule for periods of time as spelled out in their license agreement." Id. Wade explains that "[l]icensing terms ensured both experiences could coexist without undermining consumer clarity." Id. Wade adds that the individual at Faculty "who was responsible for developing and launching [CoComelon] Party Time testified in his deposition that Moonbug was clear with him that he would need to respect CoComelon Live's routing because '[he] was the tail and they were the dog.'" Id.

24

Wade also authored a rebuttal report, where he responds to the report of Michael Olsen, an expert for the CCM Parties, and reiterates the affirmative opinions in his opening report. See ECF No. 177-5. Wade disagrees with Olsen's definition of the term "show," who opined that in the location-based entertainment industry a show is any "presentation where created content is presented to an audience." Id. at 5-7. According to Wade, there is no set definition of the term "show" in the location-based entertainment industry, because attractions such as roller coasters, museum exhibitions, "participatory venues" (such as Topgolf), and "[c]reative [p]lay [e]xperiences" (such as Lego Discovery Center) "involve the presentation of creative content but are not considered 'shows.'" Id. at 6-7. Further, Wade notes that the two major trade associations governing location-based entertainment—the International Association of Amusement Parks and Attractions and the Themed Entertainment Association—also do not provide a specific industry definition of "show." Id. at 7.

   2.   *The CCM Parties' criticisms of Wade's expert report.*

First, the CCM Parties attack Wade's assertion that "[t]he central question is whether CoComelon Party Time should be considered a singular immersive experience or classified as a live theatrical offering." ECF No. 177-4 at 19. The CCM Parties argue that this question is irrelevant and will not assist the trier of fact. ECF No. 173 at 18. According to the CCM Parties, the correct "central question" is "whether Party Time (and later Sing-a-Long) are 'shows,' or derivative shows, that infringe upon CCM's exclusive rights." Id. At bottom, this is a dispute about how the legal issues should be framed for the jury, and the parties disagree on that front. See ECF No. 181 at 25-26. It is not a basis for excluding Wade's opinion, however. See Phoenix Light SF Ltd. v. Bank of New York Mellon, No. 14-CV-10104 (VEC), 2020 WL 1322856, at *12 (S.D.N.Y. Mar. 20, 2020), on reconsideration in part by, 2020 WL 2765044 (S.D.N.Y. May

25

28, 2020) ("Doubts about the legal sufficiency of Plaintiffs' theory of liability is not grounds for excluding expert testimony that assumes the viability of that theory.") (citation omitted).

Regardless, even under the issue as framed by the CCM Parties, Wade's testimony is relevant and helpful to the jury. The CCM Parties contend that the central issue in this case is whether Party Time is a "show," because Moonbug granted CCM the "sole and exclusive" right to present live ticketed CoComelon "shows." ECF No. 173 at 18. Wade opined that CoComelon Party Time is "a singular immersive experience" and not a "show." ECF No. 177-4 at 19. He opined that industry practice distinguishes between "show" rights and "immersive" rights. See Id. at 27; see also ECF No. 181 at 25-26. Wade's opinion goes to whether CoComelon Party Time is of the same ilk of entertainment offering as CoComelon Live, such that it was a "show" and thus part of the exclusive rights granted under the agreement.

Second, the CCM Parties aver that Wade "improperly interprets the evidence"—specifically, the CoComelon Party Time license agreement and the testimony of Jared Paul—by opining that Moonbug mitigated the risks of consumer confusion through "routing insulation." ECF No. 173 at 19-20 (quoting ECF No. 177-4 at 41). Wade never defines "routing insulation" but describes how Moonbug mitigated the risks of customer confusion by making agreements that required "[CoComelon] Party Time licensee[s] to avoid scheduling in cities included in CoComelon Live's touring schedule for periods of time as spelled out in their license agreement," and using "[l]icensing terms [that] ensured both experiences could coexist without undermining consumer clarity." ECF No. 177-4 at 41.

The CCM Parties provide no authority to support their contention that Wade's opinion about Moonbug's risk mitigation (or lack thereof) must be excluded because he purportedly ignored two pieces of evidence favorable to the CCM Parties. To the contrary, an expert need not

26

agree with "witness testimony concerning the objects of his analysis." In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig., 05-MD-1720 (MKB), 2022 WL 15044626, at *58 (E.D.N.Y. Oct. 26, 2022) (noting that an expert can ignore relevant evidence and that "by itself does not necessarily warrant exclusion"). And "the existence of alternative factual scenarios that an expert has not considered in rendering an opinion goes only to the weight and credibility of the expert's testimony, not its admissibility." Media Glow Digital, LLC v. Panasonic Corp. of N. Am., No. 16-CV-7907 (HBP), 2019 WL 1055527, at *5 (S.D.N.Y. Mar. 6, 2019) (citation omitted); see also R.F.M.A.S., Inc. v. So, 748 F. Supp. 2d 244, 252 (S.D.N.Y. 2010) ("To the extent that a party questions the weight of the evidence upon which the other party's expert relied or the conclusions generated from the expert's assessment of that evidence, it may present those challenges through cross-examination of the expert."). The CCM Parties can argue at trial that Wade ignored relevant evidence that Moonbug encouraged the producer of CoComelon Party Time to stake a claim in Canada before CCM could announce Canadian shows and refused to disclose Party Time's touring plans to CCM, but it is not a basis to exclude his opinion. See GeigTech E. Bay LLC v. Lutron Elecs. Co., No. 18-CV-5290 (CM), 2023 WL 6614486, at *28 (S.D.N.Y. Sept. 20, 2023) (citing Daubert, 509 U.S. at 596) (concluding that expert "should certainly be cross-examined on her failure to review certain relevant documents (if they exist), but this does not merit exclusion of her testimony").

Third, the CCM Parties contend that Wade improperly opined on a party's mental state. ECF No. 173 at 20. Specifically, the CCM Parties point to Wade's opinion that "S2BN appears to be aware of th[e] distinction between theatrical shows (like CoComelon Live) and immersive experiences (like CoComelon Party Time and CoComelon Play Date) and how they utilize different rights." See ECF No. 177-4 at 26-27.

27

Wade opined that the CCM Parties "appear[ed] to be aware" of the distinction between theatrical shows and immersive experiences in a way that is "consistent with industry custom." ECF No. 177-4 at 26 (emphasis omitted). Wade explains that "while various SB2N witnesses testified that they did not believe an 'immersive experience' was a real thing and that all [location-based experiences] are 'shows' of one form or another, other testimony . . . and contemporaneous emails indicate that SB2N was distinguishing between 'show' and 'immersive' rights in its dealings with Moonbug." Id. at 26. He points to several documents and pieces of testimony to support his contention, including a (1) "SB2N project list reflecting how SB2N organized its business . . . [that] included 'CoComelon [Live]' within its 'Family' projects and a distinct 'Moonbug Immersive (CoComelon)' within its 'Exhibition' projects," (2) a "redline of a term sheet of a joint venture between Black Sky and S2BN for a new Moonbug 'immersive experience project' under the terms of Black Sky's separate license with Moonbug," (3) an e-mail memorializing "a conversation with Moonbug about S2BN proposing a CoComelon 'touring family immersive experience,'" and (4) deposition testimony about immersive rights being outside the scope of CCM's license with Moonbug. Id. at 26-27.

This opinion is impermissible because Wade goes beyond the bounds of explaining what another party in the relevant industry would have commonly understood based on industry practice. Instead, Wade extrapolates from the factual record that he believes the CCM Parties were purportedly aware of a distinction between a show and an immersive experience, relying on documents for which he has no personal knowledge. Wade is speculating on a party's mental state and usurping the jury's role of interpreting the evidence and drawing inferences and conclusions from that evidence. See In re M/V MSC FLAMINIA, No. 12-CV-8892 (KBF), 2017 WL 3208598, at *9 (S.D.N.Y. July 28, 2017) ("An expert does not 'find' facts, an expert does

28

not opine on a party's state of mind (that a party '[misled]' or 'misrepresented' something to another), and an expert certainly cannot state that his client . . . was or was not aware of anything.").

It is not appropriate for Wade to opine on what the CCM Parties were aware of because "[i]t is well settled that an expert cannot offer evidence about a party's state of mind[.]" See In re Namenda Direct Purchaser Antitrust Litig., No. 15-CV-7488 (CM), 2019 WL 6242128, at *8 (S.D.N.Y. Aug. 2, 2019) (citing In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004)); Highland Cap. Mgmt., L.P. v. Schneider, 379 F. Supp. 2d 461, 468-70 (S.D.N.Y. 2005) (excluding portion of expert report containing the expert's "own speculation regarding the state of mind and motivation of certain parties," such as an assertion that an individual was "likely aware" of certain facts); Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC, No. 16-CV-1318 (GBD) (BCM), 2021 WL 4810266, at *18 (S.D.N.Y. Sept. 30, 2021) (explaining that "[the expert] may not testify as an expert about what [defendant] knew, should have known, had knowledge of, or had reason to know") (internal quotation marks and citation omitted); Travelers Indem. Co. v. Northrop Grumman Corp., No. 12-CV-3040 (KBF), 2014 WL 464769, at *5 (S.D.N.Y. Jan. 28, 2014) (preventing expert from opining as to "whether and to what extent the Insurers were familiar with [defendant]'s waste disposal practices due to what [the expert] surmises they must have known").

Moreover, an expert's testimony "must be directed to matters within the witness' scientific, technical, or specialized knowledge and not to lay matters which a jury is capable of understanding and deciding without the expert's help." Ajala v. W.M. Barr & Co., Inc., No. 16-CV-2615 (VEC), 2018 WL 6322147, at *5 (S.D.N.Y. Dec. 4, 2018) (internal quotation marks and citations omitted). "This principle forbids expert testimony that 'supplant[s] . . . the role of

29

the jury in interpreting the evidence,' including by providing 'factual narratives and interpretations of conduct or views as to the motivation of parties.'" Id. (quoting In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d at 541). Therefore, "[t]o the extent that [Wade] is simply rehashing otherwise admissible evidence about which he has no personal knowledge, such evidence—taken on its own—is inadmissible." See Highland Cap. Mgmt., L.P., 379 F. Supp. 2d at 468-69. This aspect of Wade's opinion is used "solely for the purpose of constructing a factual narrative based upon record evidence," which is improper. Id. Rather than hearing from Wade, the jury would benefit from testimony from witnesses who have familiarity and personal knowledge of the relevant documents. See LinkCo, Inc. v. Fujitsu Ltd., No. 00-CV-7242 (SAS), 2002 WL 1585551, at *1-2 (S.D.N.Y. July 16, 2002) (excluding expert testimony interpreting another party's conduct based on expert's "independent examination of documents [and other materials in the record]" because "testimony by fact witnesses familiar with those documents would be far more appropriate . . . and renders [the expert's] secondhand knowledge unnecessary for the edification of the jury") (citation and internal quotation marks omitted); Red Hawk, LLC v. Colorforms Brand LLC, 638 F. Supp. 3d 375, 383 (S.D.N.Y. 2022) (quoting United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994)) ("When an 'expert acts outside of [his] limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determination,' the testimony usurps the role of the jury in applying the law to the facts."); see also Media Sport & Arts s.r.l. v. Kinney Shoe Corp., No. 95-CV-3901 (PKL), 1999 WL 946354, at *3 (S.D.N.Y. Oct. 19, 1999) (explaining that where expert's testimony "is not based on personal knowledge, but instead on his review of documents and depositions produced by the parties," the expert's testimony "may not take the place of that of the individuals who actually negotiated the deal") (citations omitted).

Finally, the CCM Parties fault Wade for including "irrelevant and unhelpful information" in his report, such as a historical overview of amusement parks, a discussion of the impact of the industrial revolution on amusement parks, a discussion of the impact of virtual and augmented reality on immersive experiences, and a forecast of the future of location-based entertainment, among other things. ECF No. 173 at 20-21 (citing ECF No. 177-4 at 8-12, 19-24, 31-35). The CCM Parties contend that the Court should prohibit Wade from testifying on these topics pursuant to Federal Rules of Evidence 401 and 403. Id. at 21.

"Experts may explain background material to the extent it is relevant to their analyses and useful to the jury," and any "excessive factual narration can be curtailed at trial." See In re Keurig, 2025 WL 354671, at *8, 10. Wade's testimony in this regard offers a backdrop of the industry at issue—the live entertainment or "location-based entertainment industry"—and provides context for his opinion as to the regular customs and practices of that industry. See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig., 638 F. Supp. 3d 227, 290-93 (E.D.N.Y. 2022) (declining to exclude expert's "general opinions about platforms and ecosystems" that focused on examples like OpenTable and Facebook—even though the action centered on payment card platforms—because it was "[i]n the context of a section providing background information on business platforms and ecosystems" and experts can "discuss concepts generally before applying them to the facts at issue") (internal citation omitted); Chen v. St. Beat Sportswear, Inc., 364 F. Supp. 2d 269, 283 n.15 (E.D.N.Y. 2005) (rejecting argument that expert's testimony about history and evolution of the garment industry was irrelevant because such testimony "illuminates the history and custom of the garment industry"). Of course, to the extent Wade at trial provides such historical testimony and the testimony is excessive,

31

duplicative, or irrelevant, the CCM Parties may object, but it is not a basis for exclusion at this stage.

Accordingly, all of Wade's opinions are admissible, except his testimony as to the CCM Parties' awareness of the distinction between theatrical shows and immersive experiences.

## II.    The Moonbug Parties' <u>Daubert</u> Motion

### A.    <u>Michael Olsen</u>

#### 1.    *Olsen's expert reports*

Olsen is a live entertainment industry executive with more than 45 years of experience. ECF No. 186 at 14; ECF No. 176-1 at 16-18. He has "worked on more than 500 live shows and productions" over the course of his career. ECF No. 176-1 at 3. Olsen has worked at professional regional theatres in "various capacities," including the Yale Repertory Theatre, the Denver Center for the Performing Arts, the Asolo State Theatre, and the Opera Company of Boston. <u>Id.</u> From 2010 to 2020, he served as Executive Vice President of Operations, Legal, and Finance for the music division of Entertainment One. <u>Id.</u> at 3, 16.

In that role, Olsen "led the acquisition team that purchased a controlling interest in Round Room LLC, one of the largest producers of live children's shows in North America." <u>Id.</u> Round Room has produced children's live shows, including Blippi, Baby Shark Live!, PJ Masks Live!, and Peppa Pig Live. <u>Id.</u> Olsen served on the Board of Directors of Round Room and chaired the committees on finance and new product investment. <u>Id.</u>

Olsen was retained by the CCM Parties "to provide expert testimony on the industry custom and standard of the entertainment industry in general and the touring industry in specific." <u>Id.</u> at 4. In particular, he was asked to opine "as to the entertainment industry custom and usage of the phrases 'show,' 'promotional appearance,' and 'derivatives, spin-offs and

ancillary rights,'" as well as "industry standard and the reasonableness of CCM's decision not to tour [CoComelon Live] in potential competition with CoComelon Party Time." Id.

Olsen submitted an expert report and a rebuttal report. See id.; ECF No. 176-2. In his expert report, Olsen states that he is opining on industry standard and custom in the live entertainment and touring industry and is "not offering any opinions as to the proper interpretation of the [CoComelon Live] Agreement." ECF No. 176-1 at 4.

Olsen offers five affirmative opinions. First, Olsen opines that within the entertainment industry, the term "show" encompasses, but is not limited to, "stage shows." Id. at 5-9. Second, Olsen states that pursuant to industry standard and custom, a "promotional appearance" is a non-stand-alone and typically free event "whose primary purpose is to raise awareness and promote a product, service, or brand to the public." Id. at 9-10. Third, Olsen opines that within the entertainment industry, a "derivative" work "recasts, transforms, or adapts a preexisting work," a "spin-off" is "a new work derived from an existing property, focusing on a secondary or peripheral element of the original work," and these rights allow licensees to control related facets of licensed property and create potential works, including different iterations of a production. Id. at 10-12. Fourth, Olsen opines that it is industry custom and practice for live shows to tour in cycles. Id. at 12. And fifth, Olsen opines that "CCM's decision to pause its efforts to [tour] CoComelon Live until it could reclaim its exclusive touring rights was reasonable and consistent with the actions of other concert and tour promoters." Id. at 12-13.

Olsen's first, second, and third affirmative opinions discuss the "industry custom and usage" of the terms "show," "promotional appearance," "derivatives," and "spin-offs," as they are commonly used and understood in the entertainment industry. Id. at 5-12. With respect to "show," Olsen describes how "Moonbug claims that Party Time is not a 'show' because it does

33

not appear in a theater, take place on a stage before a seated audience, involve a scripted performance, or utilize a paid cast, director or a set." Id. at 5. He faults "Moonbug's narrow definition" of the term, opining that it "is inconsistent with the industry's definition and understanding of the word." Id. Olsen provides numerous examples of "shows" to demonstrate that "theatrical productions in BlackBox theaters, amateur community theatre productions, musical events, improv comedy shows, and music festivals such as Bonnaroo or Burning Man which draw thousands of fans" are all types of "shows," as that term is commonly understood in the entertainment and live touring industries. Id. at 6-9.

Olsen's fourth affirmative opinion is that "live shows" customarily tour in cycles, and the frequency with which shows tour "is a byproduct of a number of variables, including audience demand, financial viability, venue availability, performer availability, and the need to make creative updates to the show." Id. at 12. He also asserts that licensors "commonly insist upon a minimum number of shows within a specified period," and "licensees/producers seek to secure the longest possible term, so that [the licensee] spaces the touring cycles as it deems best." Id.

Olsen's fifth affirmative opinion is that CCM's decision to stop touring was reasonable based on licensing norms in the entertainment industry concerning exclusivity and cannibalization. Id. at 12-13. He opines that exclusivity provisions allow for market control and "protect the licensee's financial investment by limiting competition and the potential cannibalization of ticket sales by ensuring that the licensee is the sole beneficiary of the licensed property's popularity." Id. at 13. As he explains, because "the market generally cannot support simultaneous productions of the same property" and "[m]ultiple tours can result in audience fatigue, eliminate any sense of urgency in ticket-buying, erode the uniqueness of the experience, decrease ticket demand, and lower audience interest." Id. Olsen concludes that "[g]iven the

34

importance of exclusivity . . . and lacking knowledge as to when and where Party Time may tour, CCM's decision to pause its efforts to [tour] CoComelon Live until it could reclaim its exclusive touring rights was reasonable and consistent with the actions of other concert and tour promoters." Id. Olsen goes on to explain that "[i]f CCM were required to tour CoComelon Live in potential competition with Party Time, CCM might have suffered substantial monetary losses due to, among other things, market cannibalization, a need to increase marketing to avoid consumer confusion and a loss of good will." Id.

In his rebuttal report, Olsen gives five rebuttal opinions in response to opinions from experts for the Moonbug Parties. First, Olsen opines that CoComelon Party Time is a "live show" under the definition offered by Wade. ECF No. 176-2 at 4-7. Second, Olsen states that Party Time does not meet all of Wade's criteria for an "immersive experience," and the immersive experiences cited by Wade are distinguishable from CoComelon Party Time. Id. at 7-11. Third, Olsen opines that a brand's licensing of its intellectual property is governed by contract, not industry standards, in contrast to Wade's opinion that there is a "known and accepted industry standard" of intellectual property owners licensing their intellectual property "across multiple [location-based entertainment] categories." Id. at 11-12; see also ECF No. 177-4 at 6. Fourth, Olsen states that "best endeavors" is not a specialized term in the touring industry, contrary to the opinion of Grilly. Id. at 12-13. And fifth, Olsen opines that notwithstanding Wade's contrary opinion, Moonbug did not mitigate the risks that Party Time would cannibalize the market for CoComelon Live in a way consistent with industry practice and custom. Id. at 13-14.

35

2. *The Moonbug Parties' criticisms of Olsen's opinions.*

First, the Moonbug Parties challenge Olsen's qualifications, arguing that Olsen is not qualified to opine on "licensing practices within the live touring industry" or "matters related to the actual planning of a tour (such as tour routing, touring cadence, or the meaning of 'show' within the industry and whether that meaning includes 'immersive experiences')." ECF No. 175 at 9-11. The Moonbug Parties contend that Olsen lacks the necessary experience and qualifications, because he is an attorney who primarily buys and sells music catalogs, his only experience with live touring family shows is limited to the financial side of shows, and his only "business experience" with live touring family shows stems from his three years serving on the Board of Round Room, where he was only occasionally involved in negotiating licenses. Id.

To testify as an expert under Rule 702, a witness must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "Any of the five forms of qualifications will satisfy the rule, and a court makes this determination by considering the totality of the witness's background." Envy Branding, LLC v. William Gerard Grp., LLC, No. 20-CV-3182 (JLR), 2024 WL 869156, at *8 (S.D.N.Y. Feb. 29, 2024) (internal quotation marks and citation omitted). "Courts in this Circuit have liberally construed the qualification requirements of Rule 702, 'at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience.'" 523 IP LLC v. CureMD.Com, 48 F. Supp. 3d 600, 642-43 (S.D.N.Y. 2014) (quoting In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d at 559). Where an expert "has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that [he] lacks expertise in the specialized areas that are directly pertinent." Arista Recs. LLC v. Lime Grp.

36

LLC, No. 06-CV-5936 (KMW), 2011 WL 1674796, at *3 (S.D.N.Y. May 2, 2011) (citation omitted).

Olsen's background and experience suffice to qualify him as an expert in the live entertainment industry. To begin, Olsen is a "seasoned entertainment executive having worked exclusively in the entertainment industries since 1979," and he has "worked on more than 500 live shows and productions" over the course of his career. ECF No. 176-1 at 3. He previously served as Executive Vice President of Operations, Legal, and Finance for the music division of Entertainment One for ten years and served on the Board of Directors of Round Room, "one of the largest producers of live children's shows in North America." Id. Olsen was also the Vice President and General Manager of the Colorado Symphony, where he "produced and promoted more than 150 live concerts and events per year including concerts in concert halls, theaters, stadiums, arenas, and outdoor amphitheaters." Id.

The Moonbug Parties cherry pick excerpts from Olsen's deposition to support their argument that he is not qualified to testify as an expert here. The Moonbug Parties highlight that Olsen is an attorney whose "practice is primarily the buying and selling of music catalogs." ECF No. 175 at 10. They also aver that Olsen's "only experience with live touring family shows is both limited and peripheral, and his role was primarily on the 'financial side' dealing with profitability and capital investments." Id. These assertions are unavailing and mischaracterize Olsen's testimony.

To be sure, Olsen testified that buying and selling music catalogs is "mostly what [he] do[es]" and added that "[i]t's the general practice of entertainment and music law." ECF No. 176-4 at 4. But Olsen has prior direct experience with "live touring family shows or touring theatrical family shows" when he was a member of Round Room's Board from 2017 to 2020. Id.

37

at 10, 12. In that role, Olsen was responsible for the "financial side of the profitability and the operations of the whole [Round Room] division," which included "vet[ting] out those plans [for Round Room's shows]," "meet[ing] with [Round Room employees that came up with ideas for shows]," and "really go[ing] through the strategic elements" of potential ideas for shows or "possible things [for Round Room] to get involved in." Id. at 12-13. Olsen also made recommendations to senior management about whether certain shows "w[ere] something we should consider investing in." Id. at 13. As a result, Olsen was "very actively involved in a lot of the very early planning of these kinds of [live show] projects and then on the back end, evaluating how well they did . . . what went right, what went wrong, where are we projecting[.]" Id.

Olsen also was "occasionally" involved in negotiating the terms of Round Room's licenses and had the "final say and sign off on what was done." Id. at 14. He was involved in the negotiations of licenses for PJ Masks Live!, F1, the Nelson Mandella Show, "the Tupac license with the Estate of Tupac for the Tupac exhibition," Jurassic World, and "maybe Baby Shark," another children's show. ECF No. 187-1 at 7, 10-11. And as an executive at Entertainment One, Olsen "look[ed] after" the companies under Entertainment One "from a finance perspective, from an operations perspective, and from a legal perspective." ECF No. 176-4 at 6-8.

Olsen's general live entertainment industry experience, with regards to theatrical shows and concerts, coupled with Olsen's specific experience at Round Room with live touring family shows specifically, suffice to permit him to testify as an expert here. In this Circuit, "'[i]f the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent.'" See Ultra Recs., LLC

v. Ultra Int'l Music Publ'g, LLC, No. 22-CV-9667 (AS), 2024 WL 4663011, at \*2 (S.D.N.Y. Nov. 4, 2024) (quoting In re Zyprexa Prods. Liab. Litig., 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007)). Olsen has ample experience in the live entertainment industry given his background with theatrical shows and concerts. See ECF No. 176-1 at 3, 16-18.

Olsen also has specific experience with live family shows, through his role on the Board of Round Room. In that role, Olsen's responsibilities were wide-ranging, requiring him to oversee numerous aspects of live productions, including financial and operational aspects. See ECF No. 176-4 at 5-8, 12-14. Olsen's broad experience across various aspects of the live entertainment industry is sufficient. See Emig v. Electrolux Home Prods. Inc., No. 06-CV-4791 (KMK), 2008 WL 4200988, at \*5 (S.D.N.Y. Sept. 11, 2008) (explaining that expert who lacked "much, if any, experience preparing instructions for consumer products" but had evaluated and drafted "instructions for industrial assembly and temporary workers" was qualified "to testify as an expert on the adequacy of assembly instructions" even without "significant experience in the particular area of consumer instructions"); Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 691 F. Supp. 2d 448, 478-79 (S.D.N.Y. 2010) (explaining that expert's "lack of *specific* experience with hedge fund audits is not necessarily determinative" given expert's "substantial auditing experience") (emphasis in original); Envy Branding, LLC, 2024 WL 869156, at \*8 (concluding that expert was qualified to opine on industry norms about the entitlement to commissions where expert had experience representing talent clients in entertainment-related transactions and was involved with brand managers and management companies "regarding all aspects of their business").

Additionally, Olsen sufficiently "explain[s] how [his] experience leads to the conclusion[s] reached, why that experience is a sufficient basis for [his] opinion, and how that

experience is reliably applied to the facts." See Pension Comm. of Univ. of Montreal Pension Plan, 691 F. Supp. 2d at 473 n. 148 (quoting Fed. R. Evid. 702 advisory committee's note). Each of Olsen's opinions discuss the "standard[s] and custom[s]" and "recognized practice[s]" of the entertainment industry. See, e.g., ECF No. 176-1 at 10, 12; ECF No. 176-2 at 11, 13, 14. And Olsen gained an understanding of those standards and practices, as it concerns live touring family shows, from his time at Round Room and his involvement with the operational side of Round Room's productions. ECF No. 176-4 at 12-14; see Envy Branding, LLC, 2024 WL 869156, at *8 (admitting expert testimony "to the extent that [the expert] draws on his experience in the entertainment industry to opine on industry norms"). In that role, he was responsible for making recommendations about what shows were worth investing in and "continually stay[ing] on top of what was happening [with live touring show projects] from a financial perspective and from a success and failure perspective." ECF No. 176-4 at 13-14. Viewed holistically, Olsen's experience creates a sufficient foundation for him to reliably opine on industry customs, standards, and practices.

Turning to the specific opinions in Olsen's reports, the Moonbug Parties attack Olsen's second and third affirmative opinions and his third and fifth rebuttal opinions on the grounds that they consist of improper legal conclusions concerning the interpretation of the CoComelon Live Agreement. ECF No. 175 at 11-16. Only Olsen's fifth rebuttal opinion is improper.

As it concerns Olsen's second and third affirmative opinions, and his third rebuttal opinion, those opinions properly discuss industry standard and custom. In his second affirmative opinion, Olsen opined that it is commonly understood in the industry that a "promotional appearance is an event whose primary purpose is to raise awareness and promote a product, service, or brand to the public;" such events are "customarily free;" and such events are "not

stand-alone events." ECF No. 176-1 at 10. Olsen further opined that a "promotional appearance" in the industry does not include a "show that sells tickets for a non-nominal fee (unrelated to crowd control purposes) and seeks to generate a profit from the show itself." Id. In his third affirmative opinion, Olsen opined that in the entertainment industry "a 'derivative' work recasts, transforms, or adapts a preexisting work," and a "spin-off is a new work derived from an existing property, focusing on a secondary or peripheral element of the original work." Id. at 11. Olsen further opined that the "acquisition of derivative and spin-off rights is both common and critical in the live touring industry." Id. In his third rebuttal opinion, Olsen rejects Wade's contention that there is a "known and accepted industry standard" of intellectual property owners licensing their intellectual property across "multiple" location-based entertainment categories. ECF No. 176-2 at 11-12. Instead, Olsen opines that industry custom is "irrelevant" because whether a particular property can be licensed is governed by contract, not industry standards. Id. As to all of these opinions, the Moonbug Parties argue that Olsen improperly offers a legal conclusion (ECF No. 175 at 11-16), but as discussed below, these opinions are proper discussions of industry standards.

Experts are permitted to testify about the "custom and usage" of terms in a particular industry. Restivo, 846 F.3d at 580 (citation omitted). Importantly, Olsen does not testify as to the parties' intent in using these terms in the agreement. See Patriarch Partners Agency Servs., LLC, 2025 WL 2592224, at *13 (explaining that "[a]lthough experts may not offer legal conclusions, such as what a contract means or whether a party breached, experts may opine on relevant industry custom as informed by the expert's experience"). Instead, in his second and third affirmative opinions, Olsen merely explains how the terms "promotional appearance," "derivatives," and "spin-offs" —which appear in the CoComelon Live Agreement—are

41

commonly understood in the entertainment industry. Such testimony is permissible. See Red Hawk, LLC, 638 F. Supp. 3d at 383 (explaining that although the expert "may not opine on what the parties to the Royalty Agreement intended by the term Net Sales or Products," the expert "can testify generally about how the terms 'product' and 'net sales' are used in the industry").

In addition to the customary usage of industry terms, experts may also testify about whether a party's actions comport with industry customs and standards. See Oestreicher, 2025 WL 3755609, at *3 (quoting Primavera Familienstifung, 130 F. Supp. 2d 529) ("[I]t is proper for an expert to testify as to the customs and standards of an industry, and to opine as to how a party's conduct measured up against such standards."). Olsen's third rebuttal opinion falls within this ambit. Here, Olsen was responding to Wade's own testimony concerning industry practice related to an intellectual property owner's licensing of their intellectual property. See ECF No. 176-2 at 11-12. As Olsen explained, he disagreed with Wade's contention that it is industry practice for an intellectual property owner to license their intellectual property across multiple categories. See ECF No. 176-2 at 11-12; ECF No. 177-4 at 6. Instead, Olsen opined that it is industry practice for an intellectual property owner to note that the grant of rights is limited and non-exclusive if the owner intends to grant a limited set of rights. ECF No. 176-2 at 11-12; see ValveTech, Inc. v. Aerojet Rocketdyne, Inc., No. 17-CV-6788 (FPG), 2023 WL 3558214, at *5 (W.D.N.Y. May 19, 2023) (explaining that "[the expert] is, of course, free to reference the contracts in discussing his opinions, and he may testify about general industry practices regarding the protection of proprietary information and whether [the plaintiff]'s measures, including its contracts, were generally consistent with those practices").

Turning to Olsen's fifth rebuttal opinion, Wade opined that Moonbug mitigated the risk that CoComelon Live and CoComelon Party Time would be present in the same market at the

same time consistent with industry, practice, and custom. ECF No. 177-4 at 41. Disagreeing with that opinion, Olsen states that "there is no radius provision that applies to 'immersive shows,' 'ticketed character appearances,' or any ticketed performance" in the CoComelon Live Agreement. ECF No. 176-2 at 14. Olsen goes on to state that "the radius provision contained in the Exclusive Agreement applies solely to '*non-ticketed* costume character *promotional appearances* outside of the CoComelon [Live] Tour (e.g., at schools or malls).'" Id. (quoting ECF No. 127-1 at ¶ 1.6) (emphasis in original). Olsen then relies on evidence adduced in discovery to argue that Moonbug encouraged Faculty Productions to "stake its claim" to Toronto, with the "apparent intention of undermining the radius clause" in the parties' agreement. Id. This opinion is impermissible for several reasons.

First, Olsen's description of the radius provision in the CoComelon Live Agreement is "based solely on common tools of contract interpretation, namely, the structure and content of the [CoComelon Live] Agreement, that are equally accessible to the jury." See Red Hawk, LLC, 638 F. Supp. 3d at 383; Starr Indem. & Liab. Co. v. Brightstar Corp., 388 F. Supp. 3d 304, 346 (S.D.N.Y. 2019), aff'd by, 828 F. App'x 84 (2d Cir. 2020) (explaining that experts' reports "essentially consist[ing] of the experts' own views on the interpretation of the contract . . . could not assist any finder of fact in addressing any issues in this case"); LoanCare, LLC v. Dimont & Assocs., LLC, No. 22-CV-9286 (MMG), 2025 WL 951585, at *16-17 (S.D.N.Y. Mar. 28, 2025) (striking portions of expert report "contain[ing] legal conclusions regarding interpretation of contractual language"). Because this testimony fails to offer "specialized knowledge, not possessed by the jury," see United States v. Carson, 702 F.2d 351, 369 (2d Cir. 1983), it would not be helpful to the jury. See Actors Fed. Credit Union v. CUMIS Ins. Soc'y, Inc., No. 11-CV-2129 (AJN), 2012 WL 13070024, at *2 (S.D.N.Y. Sept. 18, 2012) (quoting Marx & Co., Inc. v.

43

Diners' Club, Inc., 550 F.2d 505, 510 (2d Cir. 1977)) ("The question of interpretation of the contract is for the jury and the question of legal effect is for the judge. In neither case do we permit expert testimony.").

Second, to the extent Olsen opines that Moonbug acted with an apparent intent to undermine the radius provision in the agreement, such testimony goes beyond addressing industry customs and impermissibly intrudes into a factual question for the jury.[7] As already discussed, an "expert[ ] may not offer opinions regarding the intent or motive of parties as part of their analysis." See Scott, 315 F.R.D. at 45-46; Anderson News, L.L.C. v. Am. Media, Inc., No. 09-CV-2227 (PAC), 2015 WL 5003528, at *3 (S.D.N.Y. Aug. 20, 2015), aff'd by, 899 F.3d 87 (2d Cir. 2018) (explaining that expert report "improperly opine[d] on the parties' knowledge, motivations, and intent" by making statements such as "[plaintiff] intended its proposed [ ] [s]urcharge to be negotiable").

Third, by opining that Moonbug's conduct was inconsistent with the radius provision in the CoComelon Live Agreement, Olsen improperly reaches a disputed factual issue—whether Moonbug breached the CoComelon Live Agreement. See Actors Fed. Credit Union, 2012 WL 13070024, at *2 (explaining that it would be "improper for [the expert] to testify as to his interpretation of either [a contract and a fidelity bond] because experts are not permitted to simply interpret disputed contracts"); Mirkin v. XOOM Energy, LLC, No. 18-CV-2949 (ARR) (JAM), 2025 WL 16333, at *4 (E.D.N.Y. Jan. 2, 2025) ("[I]t is well settled that an expert may

---

[7] Olsen also opined that "radius clauses are commonly used in the entertainment business," noted that such clauses are "designed to protect the production company that is either first-in-time or which possesses superior rights," and explained that "[i]n instances w[h]ere multiple licenses are permitted, industry custom and standard requires that the licensor . . . protect both licensees' interests." ECF No 176-2 at 13-14. These portions of the opinion are a discussion of industry standards and custom, and are thus permissible.

not testify as to what obligations are imposed by a contract.") (citation omitted); Breezy Point

Co-Op., Inc. v. Cigna Prop. and Cas. Co., 868 F. Supp. 33, 36 (E.D.N.Y. 1994) (noting that an

expert is barred from proffering an opinion with respect to the parties' legal obligations pursuant

to a contract). This dispute is at the center of this action, as the CCM Parties' amended complaint

alleges that CCM did not breach the agreement, and that alternatively, "any breach is excused by

Moonbug's antecedent material breach of the [CoComelon Live Agreement]." ECF No. 32 at

¶ 85. In their amended counterclaims, the Moonbug Parties respond that its licensing of the

intellectual property to "a different company to put on" the CoComelon Party Time production

did not excuse CCM's non-performance. ECF No. 43 at ¶¶ 3-5. These assertions demonstrate

that one of the issues for the trier of fact is whether Moonbug complied with its obligations in the

CoComelon Live Agreement, specifically as it concerns Paragraph 1.6, which reserved certain

rights to Moonbug.

Next, the Moonbug Parties argue that Olsen's first and fourth affirmative opinions should

be excluded because he provides nothing beyond *ipse dixit* to support them. ECF No. 175 at 17-

18. In his first affirmative opinion, Olsen talks about the commonly understood meaning of the

term "show" in the entertainment industry, and he opines that the term "show" includes, but is

not limited to, "stage shows." ECF No. 176-1 at 5-9. He further provides examples of "shows"

that are inconsistent with the Moonbug Parties' definition of the term. Id. And in his fourth

affirmative opinion Olsen opines that it is industry custom for "live shows to tour in cycles," and

it is not industry standard for a tour to appear in the same market twice within a 12-month

period. Id. at 12. The Moonbug Parties' attack on these opinions is meritless.

"[A] proffered expert who relied solely on his or her experience in arriving at his or her

expert opinion must have based that opinion on sufficient facts or data, and must explain how

45

that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Veleron Holding, B.V. v. Morgan Stanley, 117 F. Supp. 3d 404, 444 (S.D.N.Y. 2015) (internal quotation marks and citations omitted). As Olsen explains, all of his opinions are based on his many years of experience in the live entertainment industry. See ECF No. 176-1 at 3 (explaining that his opinions are based upon his "experience in the live stage, entertainment production, and music and entertainment industry, my review of various documents and deposition transcripts, and the assumptions and information, including the description of the factual background contained herein, provided to me by CCM's counsel"). As discussed, see supra pp. 32, 37, Olsen has worked on more than 500 live shows and productions over the course of his career, ranging from concerts to live touring family shows. See ECF No. 176-1 at 3, 16-18. And his experience with live touring family shows included involvement in the "very early planning of these kinds of [live show] projects and then on the back end, evaluating how well they did . . . what went right, what went wrong, where are we projecting[.]" ECF No. 176-4 at 12-13. Olsen also provides extensive examples of shows that comport with his understanding of the industry customs and practices. See ECF No. 176-1 at 6-9. Additionally, Olsen reviewed relevant documents pertaining to this action, including the CoComelon Live Agreement, deposition transcripts and exhibits, and media discussing and/or promoting CoComelon Live and CoComelon Party Time. Id. at 19-21.

An opinion based on an expert's industry experience and review of relevant documents is not *ipse dixit*. Giladi v. Strauch, No. 94-CV-3976 (RMB) (HBP), 2007 WL 415365, at *9 (S.D.N.Y. Feb. 6, 2007) (concluding that expert's opinions were not "mere *ipse dixit* pronouncements" where opinion was based on review of records and "extensive experience" in

46

industry); SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC, 467 F.3d 107, 132-33 (2d Cir. 2006) (same); see also Music Royalty Consulting, Inc. v. Reservoir Media Mgmt., Inc., 598 F. Supp. 3d 158, 195 (S.D.N.Y. 2022) ("[The expert] has extensive experience in the music industry, rendering his opinions on industry custom and practice sufficiently reliable."). To the extent the Moonbug Parties believe there are "any gaps or inconsistencies in the reasoning leading to" Olsen's opinion, "such arguments go to the weight of the evidence, not to its admissibility." Novartis Pharma AG v. Incyte Corp., No. 20-CV-400 (GHW), 2024 WL 3608338, at *15 (S.D.N.Y. July 29, 2024) (internal quotations marks and citations omitted).

Finally, the Moonbug Parties attack Olsen's fifth affirmative opinion. In that opinion, Olsen opines that the CCM Parties reasonably refused to tour CoComelon Live in potential competition with CoComelon Party Time. ECF No. 176-1 at 12-13. As part of his fifth affirmative opinion, Olsen states that it "was reasonable and consistent with the actions of other concert and tour promoters" for the CCM Parties "to pause [ ] efforts to CoComelon Live until [they] could reclaim [their] exclusive touring rights." See ECF No. 176-1 at 13. But that opinion exceeds Olsen's role of proffering testimony about relevant industry practice and impermissibly intrudes into the province of the jury.

Olsen overstepped his role by opining on a question for the jury—namely, whether Moonbug breached the right of exclusivity, rendering CCM's decision to stop touring reasonable. See ECF No. 32 at ¶¶ 43-54, 77-82, 85; ECF No. 43 at ¶¶ 45, 57-72. That dispute is at the center of this action. The CCM Parties' amended complaint states that "CCM maintains that it has not breached the [CoComelon Live Agreement] and, alternatively, that any breach is excused by Moonbug's antecedent material breach of the [CoComelon Live Agreement]." ECF No. 32 at ¶ 85. In their amended counterclaims, the Moonbug Parties respond that "CCM has

misguidedly attempted to blame Moonbug for CCM's failure to successfully tour, arguing that Moonbug's licensing of its CoComelon intellectual property to a different company to put on [CoComelon Party Time] excused CCM's non-performance and prevented CCM's rights to countries in which the CoComelon [Live] Tour was never launched from reverting to Moonbug." ECF No. 43 at ¶ 3. The amended counterclaims further state that CCM materially breached the CoComelon Live Agreement by "fail[ing] to fulfill its contractual obligations relating to the CoComelon Tour," or in the alternative, that "CCM's refusal to tour is a breach of the implied covenant of good faith and fair dealing[.]" Id. at ¶¶ 61, 64, 70. These contentions make clear that an issue for the trier of fact is whether CCM's refusal to tour was justified, and CCM's contention is that it was justified in refusing to tour because Moonbug had breached the exclusivity right in the agreement.

Olsen's opinion that CCM acted reasonably in pausing the tour until it could regain exclusivity goes to the heart of this dispute. And indeed, Olsen confirmed in his deposition that he was offering "an opinion that [CoComelon] Party Time breached their exclusive rights, and at that point, Moonbug was in breach of the agreement." ECF No. 176-4 at 33. Because Olsen's fifth affirmative opinion delves into the legal obligations of the parties under the agreement, it must be precluded. See Alto v. Sun Pharm. Indus., Inc., No. 19-CV-9758 (GHW), 2021 WL 4803582, at *10 (S.D.N.Y. Oct. 13, 2021), judgment entered by, 2021 WL 4805430 (S.D.N.Y. Oct. 14, 2021) (explaining that "experts are not allowed to opine on the ultimate question of whether a party has breached the terms of a contract, even when that contract calls for following an industry custom or practice on which that expert may opine"); Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp. NV., 14 F. Supp. 2d 391, 404 (S.D.N.Y. 1988) (excluding expert's testimony on whether plaintiff had probable cause to believe defendant had breached their

48

contract because the expert would "have to discuss his construction of the contract and the parties' obligations thereunder," "usurp[ing] the role of the jury").

B. Felix Barrett

1. *Barrett's expert report*

Barrett is the founder and artistic director of a British theater company that specializes in participatory and immersive productions and is well-known for creating "Sleep No More," a retelling of Shakespeare's "Macbeth." ECF No. 176-3 at 3. The CCM Parties retained Barrett to rebut several of the opinions offered by Wade. Id. at 4. Barrett therefore did not submit an affirmative expert report; he offered three rebuttal opinions: (1) "there is no industry-standard or uniform definition of an 'immersive experience,'" (2) "'immersive experiences' can be 'live shows,' and vice versa," and (3) immersive experiences do not "implicate different rights" from live shows. Id. at 4-7.

In his first opinion, Barrett responds to Wade's opinion that there is a distinction between live shows and immersive experiences. Contrary to Wade's contentions, Barrett opines that there is no industry-standard or uniform definition of an "immersive experience" in the live entertainment industry. Id. at 4; see, e.g., ECF No. 177-4 at 7, 15-17. Barrett explains that the term "immersive," which was previously used to "describe shows that placed the audience within the story," has been used "by practitioners, marketers, PR firms and enterprising production companies to describe a wide variety of types of exhibitions and shows." ECF No. 176-3 at 4. He adds that the term over time has become a "buzzy and overused marketing term" that critics have noted now feels "largely meaningless." Id. Barrett thus disagrees with Wade's suggestion that an "immersive experience" has a "standard or uniform meaning within the live entertainment industry." Id.

49

Next, Barrett responds to Wade's opinion that an "immersive experience" and a "live theatrical offering" are distinct types of live production experiences. Id. at 5; see ECF No. 177-4 at 19. Barrett instead opines that immersive experiences can be live shows, explaining that the inquiry of whether a production is a live show or an immersive experience is not "binary." ECF No. 176-3 at 5. As an example, Barrett explains that Sleep No More, a production created by his theater company, features the elements that Wade asserts are the defining characteristics of an immersive experience, yet "is uniformly and universally recognized and referred to as a 'show' within the industry." Id. He states that other productions created and put on by his theater company are "similarly recognized as [ ] shows" by the media, the British Academy of Film and Television Arts, the Society of London Theatre, and the American Theatre Wing, despite involving so-called immersive elements such as "put[ting] on a spooky mask," "wander[ing] through a dark, cavernous, hyper-detailed world full of eerie hidden rooms," and "follow[ing] sexy dancer-slash-actors around as they enact the *show's* diffuse plot." Id. at 6-7 (emphasis in original). Thus, Barrett opines that live shows and immersive experiences are not mutually exclusive categories, contrary to Wade's opinion. Id. at 7.

As to his third and final opinion, Barrett disagrees with Wade's assertion that immersive experiences "implicate different rights" than live shows. Id. Barrett opines that "[w]hen an exclusive license agreement provides for the grant of live show rights," it is industry custom and standard for the license to "cover[ ] both stage and immersive rights." Id. According to Barrett, "[w]hen a license agreement is either non-exclusive, or seeks to make a distinction between live stage rights and live immersive rights, there are express contractual provisions delineating the rights (which, in my personal experience, are preceded by explicit discussions on the point)." Id. Barrett adds that as a "general rule," licensees "aim to secure the broadest grant of rights"

50

especially because a production may evolve over time. Id. As an example, he again refers to Sleep No More and explains that the production had several different iterations. Id. Barrett concludes by explaining that "[a]cquiring the broadest grant of rights, including the rights to derivative works and spin-offs, ensures that the license[e] has the creative freedom to reinvent the show." Id.

### 2. *The Moonbug Parties' criticisms of Barrett's third rebuttal opinion.*

The Moonbug Parties attack only Barrett's third opinion—that immersive experiences implicate different rights from live shows—on the grounds that it is an improper legal conclusion. ECF No. 175 at 19-20. They argue that the opinion "crosses the line into telling the jury that the license granted to CCM included both stage and immersive rights, and therefore the license granted [by Moonbug] to Faculty [for CoComelon Party Time] was a breach of the [CoComelon Live] Agreement." Id. at 19.

Federal Rule of Civil Procedure 26 defines rebuttal expert testimony as testimony "intended solely to contradict or rebut evidence on the same subject matter identified [in the expert testimony offered] by another party[.]" Fed. R. Civ. P. 26(a)(2)(D)(ii). "The rebuttal expert's testimony should be to explain, repel, counteract or disprove evidence presented by the expert to whom he or she is responding." Carroll v. Trump, No. 22-CV-10016 (LAK), 2023 WL 2652636, at *2 (S.D.N.Y. Mar. 27, 2023), aff'd by, 124 F.4th 140 (2d Cir. 2024) (internal quotation marks, citations, and alterations omitted). And "[a]lthough an expert may give his opinion to help the jury decide an issue, he may not substitute his judgment for the jury's by telling the jury what decision to make." Dibella v. Hopkins, No. 01-CV-11779 (DC), 2002 WL 31427362, at *3 (S.D.N.Y. Oct. 30, 2002).

51

Wade opines that in his experience "while [CoComelon Live and CoComelon Party Time] utilize the same intellectual property (IP), they represent distinct consumer offerings and different licensed rights." ECF No. 177-4 at 6. Barrett responds to Wade's opinion, explaining that in his experience, immersive experiences and live shows do not involve separate rights unless there are express contractual provisions saying so. ECF No. 176-3 at 7. That opinion directly responds to Wade's opinion that the two types of productions involve distinct rights, and it also addresses what Wade believes is industry practice. As the CCM Parties correctly argue (ECF No. 186 at 16), the Moonbug Parties cannot simultaneously argue that Wade is offering testimony about industry custom while attacking the CCM Parties' expert as impermissibly offering a legal conclusion. At bottom, Wade and Barrett are both offering the same type of opinion about the industry custom surrounding the rights associated with two types of productions. Because Barrett exclusively discusses customs, standards, and generalities surrounding the rights associated with different types of productions, this testimony is both helpful to the jury and admissible. See Patriarch Partners Agency Servs., LLC, 2025 WL 2592224, at *15 ("[E]xpert opinions discussing . . . what is (or is not) consistent with (or typical of) industry customs and practice . . . may reliably assist the trier of fact.") (citation omitted); SEC v. Ripple Labs, Inc., No. 20-CV-10832 (AT), 2023 WL 5670711, at *14 (S.D.N.Y. Mar. 6, 2023) (explaining that "expert witness testimony may explain how a contract operates in the marketplace" and permitting expert to "provide[ ] a framework" for categorizing contracts and understanding their commercial purposes in the industry where his testimony was "limited to describing the commercial purposes of certain contracts and specific provisions common to those contracts") (citations omitted).

## CONCLUSION

For the foregoing reasons, the CCM Parties' motion to exclude (ECF No. 167) is **GRANTED** in part and **DENIED** in part. The Moonbug Parties' motion to strike (ECF No. 170) is **GRANTED** in part and **DENIED** in part.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 167 and 170.

**SO ORDERED.**

DATED:     New York, New York
           March 27, 2026

_____
VALERIE FIGUEREDO
United States Magistrate Judge

53